1  STEPHANIE YONEKURA
   Acting United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   SANDY N. LEAL (Cal. Bar No. 207179)
4  Assistant United States Attorney
        Ronald Reagan Building & U.S. Courthouse
5       411 West Fourth Street
        Santa Ana, California 92701
6       Telephone: (714) 338-3500
        Facsimile: (714) 338-3564
7       E-mail: Sandy.Leal@usdoj.gov
   DANIEL H. WEISS
8  Trial Attorney
   Civil Rights Division
9       U.S. Department of Justice
        950 Pennsylvania Avenue, N.W.
10      Washington D.C. 20530
        Telephone: (202) 616-6594
11      Facsimile: (202) 514-8336
        E-mail:   Daniel.Weiss@usdoj.gov
12
   Attorneys for Plaintiff
13 UNITED STATES OF AMERICA

14                 UNITED STATES DISTRICT COURT

15             FOR THE CENTRAL DISTRICT OF CALIFORNIA

16 UNITED STATES OF AMERICA,          SA No. CR 12-97(A)-JLS

17            Plaintiff,              GOVERNMENT'S SENTENCING MEMORANDUM
                                      AND RESPONSE TO DEFENDANT PORTER'S
18            v.                      SENTENCING MEMORANDUM

19 ROSHAUN NAKIA PORTER,              Hearing Date: Feb. 20, 2015
      aka "Kevin,"                    Hearing Time: 10:30 a.m.
20    aka "Junior,"                   Location:    Courtroom of the
   MARQUIS MONTE HORN,                             Hon. Josephine L.
21    aka "Taylor,"                                Staton

22            Defendants.

23

24       Plaintiff United States of America, by and through its counsel

25 of record, the United States Attorney for the Central District of

26 California and Assistant United States Attorney Sandy N. Leal, and

27 Daniel H. Weiss, Trial Attorney, United States Department of Justice,

28

1   Civil Rights Division, hereby submits this Sentencing Memorandum,

2   which will also serve as a response to Defendant Porter's Sentencing

3   Memorandum, filed December 28, 2014.   Sentencing in this matter is

4   scheduled for February 20, 2015 at 10:30 a.m.

5

6   Dated: February 5, 2015          Respectfully submitted,

7                                    STEPHANIE YONEKURA
                                     Acting United States Attorney

8                                    ROBERT E. DUGDALE
                                     Assistant United States Attorney
9                                    Chief, Criminal Division

10

11                                        /s/
                                     _____
                                     SANDY N. LEAL
12                                   Assistant United States Attorney

13                                        /s/
                                     _____
                                     DANIEL H. WEISS
14                                   Trial Attorney
                                     Civil Rights Division

15                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

DESCRIPTION                                                      PAGE

3

TABLE OF AUTHORITIES ......................................... ii

4

I.      INTRODUCTION. ......................................... 1

5

II.     SUMMARY ............................................... 2

6

III.    GUIDELINES CALCULATIONS .............................. 10

7

IV.     MANDATORY RESTITUTION ................................ 17

8

V.      AMOUNT OF LOSS ....................................... 18

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## TABLE OF AUTHORITIES

DESCRIPTION

PAGE

FEDERAL CASES

Gall v.  United States,
        552 U.S. 38 (2001) ..................................... 10

Kimbrough v. United States,
        552 U.S. 85 (2007) ..................................... 10

Koon v. United States,
        518 U.S. 81 (1996) ..................................... 15

United States v. Marcial-Santiago,
        447 F.3d 71 (9th Cir 2006) ............................. 15

FEDERAL STATUTES

18 U.S.C. § 4   ............................................... 2

18 U.S.C. § 1593 ............................................. 17

18 U.S.C. § 1594(c) ....................................... 1, 17

18 U.S.C. § 3553 ............................................. 17

18 U.S.C. § 3553(a) ......................................... 12

18 U.S.C. § 3663A(c)(1)(B) .................................. 17

18 U.S.C. § 371 .............................................. 2

29 U.S.C. § 201, et seq. .................................... 18

SENTENCING GUIDELINES

U.S.S.G. § 2X1.1 ............................................ 11

U.S.S.G. § 2G.1.1. .......................................... 11

U.S.S.G. § 3D1.4 ............................................ 11

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On February 27, 2013, defendant Roshaun Nakia Porter ("Porter") was charged in a first superseding indictment with conspiracy to engage in sex trafficking, in violation of Title 18, United States Code, Section 1594(c), and seven counts of sex trafficking by force, fraud or coercion, in violation of Title 18, United States Code, Section 1591(a)(1). Specifically, the first superseding indictment alleged that Porter, at times assisted by co-defendant Marquis Monte Horn ("Horn"), recruited numerous victims to work in his prostitution organization and employed various coercive tactics to induce the victims into engaging in prostitution, including: developing a romantic relationship with the victims; falsely promising work as an escort only; falsely promising to care for the victims and their families financially; falsely promising to assist the victims in obtaining lawful status in the United States; isolating the victims from their family and friends; harming the victims physically, psychologically, and financially; and threatening serious harm to the victims and their families. Porter engaged in such activities for profit from 2010 until his arrest in April 2012. The indictment charged Porter and Horn with conspiracy to engage in sex trafficking and sex trafficking of victim L.C. The indictment separately charged Porter with six counts of sex trafficking of victims N.G., T.T., K.M., C.T., K.L. and M.M.

On July 11, 2014, Porter pleaded guilty to conspiracy to engage in sex trafficking, in violation of 18 U.S.C. § 1594(c). Co-defendant Horn pleaded guilty to violating 18 U.S.C. § 1594(c) on the

same date.  On October 24, 2014, this Court sentenced co-defendant Horn to a term of imprisonment of 78 months, five years of supervised release, a $100 special assessment, and, following a restitution hearing on December 19, 2014, ordered Horn to pay restitution totaling $69,719.34, jointly and severally with defendant Porter, to compensate L.C. for her lost wages.  Defendant May Moua pleaded guilty to violating 18 U.S.C. § 4, misprision of a felony and defendant Valsin Francois has pleaded guilty violating 18 U.S.C. § 371, conspiracy to engage in sex trafficking, in connection with this matter.  Francois' sentencing is scheduled for March 20, 2015 and Moua's sentencing is scheduled for April 19, 2015.

II.  SUMMARY OF PERTINENT FACTS

The government maintains that the factual summary set forth in ¶¶ 13-27 of the PSR is accurate, but offers the following additional information, derived from the victims' statements, which further demonstrate Porter's disregard for his victims' humanity, and the harmful impact of his criminal acts.

A.  N.G. (PSR ¶ 15)

N.G. has provided a victim impact statement, which is attached as Exhibit 1.  As N.G. poignantly expresses in her letter to the Court, Porter's exploitation was extremely traumatic for her and caused lasting injury.  N.G. also provided the following information during her interviews with law enforcement.  The redacted FBI 302s are attached as Exhibit 2.

Porter met N.G. after she responded to his fraudulent personal advertisement on craigslist.com in which he characterized himself as a successful person working in the film industry.  (Ex. 2, p. 10.)

Porter dated N.G. for several months and persuaded her that they were boyfriend and girlfriend. (Ex. 2, p. 10-11.) Porter convinced N.G. to go on dinner dates with older men to earn money, but within a short time thereafter, Porter announced that "things were going to be different." (Ex. 2, p. 12.) Porter took N.G. to a cheap motel, photographed her in lingerie, and posted her on craigslist.com for prostitution. (Id.) Porter kept N.G. at the motel for 20 days where he required her to service prostitution customers and relinquish the earnings to him. (Id.) Initially, N.G. saw three-four customers per day, but later serviced as many as eight-ten per day. (Ex. 2, p. 21.) After this initial exploitation, Porter continued prostituting N.G., in addition to other victims, at various hotels in Orange County for the succeeding two years.

During her victimization, Porter took multiple explicit photographs and videos of N.G. engaged in sex acts with prostitution customers. (Ex. 2, p. 28-29.) Porter video taped N.G. and other victims while hiding in the hotel room closets or armoires. Porter threatened to send videos and photos to N.G.'s family in Europe. (Ex. 2, p. 28.) Porter also controlled N.G. in other ways, including requiring her to post photos of herself with Porter on her Facebook, describing him as "my future husband" and with captions such as "I'm spending a day with my sexy man at the beach." (Id.) He also threatened to post videos of N.G. engaged in prostitution on her Facebook page if she took these photos down. (Id.)

N.G. feared Porter would beat her if she did not prostitute and would leave her with nothing. (Ex. 2, p. 23.) In addition to the physical and mental abuse N.G. suffered personally, she observed

1  Porter exercise control over numerous other victims.  For example,
2  N.G. saw Porter leave victim T.T. naked, locked in a hotel room, with
3  no personal belongings.  (Ex. 2, p. 16.)  Porter would tell N.G.
4  "What's yours is mine."  (Ex. 2, p. 27.)

5       T.T.  (PSR ¶¶ 16-17)

6       T.T. has provided a victim impact statement, attached as Exhibit
7  3, describing the profound and scarring impact of her victimization
8  by the defendant.  T.T. and her ex-husband provided the following
9  information during their interviews with law enforcement.  The
10 redacted FBI 302s are attached as Exhibit 4.

11      When T.T. met Porter, she was separated from her husband and
12 employed as an executive assistant.  (Ex. 4, p. 46.)  When T.T.'s ex-
13 husband learned that Porter was assaulting and prostituting her, he
14 tried to confront Porter and extricate T.T.  (Ex. 4, p. 40.)  Porter
15 responded by contacting his cousin, a former professional football
16 player who had spent five years in prison, to help him beat up T.T.'s
17 ex-husband.  (Id.)  Fortunately, en route to the confrontation,
18 Porter and his would-be accomplice were intercepted by the police.
19 (Id.)

20      L.C.  (PSR ¶¶ 18-19)

21      L.C. has provided a victim impact statement, attached as Exhibit
22 19, also describing the profound and scarring impact of her
23 victimization by the defendant.  L.C. provided the following
24 information during her interviews with law enforcement.  The redacted
25 FBI 302s are attached as Exhibit 5.

26      Porter recruited and groomed L.C. in the same manner as N.G.,
27 first by deceiving her that he was romantically interested in her,
28

4

manipulating her into agreeing to dinner dates, and then using
violence and control to compel her to prostitute.  (Ex. 5, p. 57-59.)
L.C. had been gainfully employed as a receptionist in a physical
therapy practice for a year when Horn recruited her and introduced
her to Porter.  (PSR ¶ 18.)  When Porter first took L.C. to a hotel
to service prostitution customers, she protested that she did not
want to prostitute and wanted to keep the job she had.  (Ex. 5, p.
59.)  Porter told her, "You work for me, now" and proceeded to beat
her and pull out her hair, leaving her crying and in a state of
shock.  (Id.)  Porter began exploiting L.C. for prostitution around
the time of the Superbowl in February 2011, when Porter gave L.C.
condoms and sat with her in hotel room monitoring the incoming
customer calls to ensure that L.C. scheduled prostitution
appointments.  (Ex. 5, p. 59-60.)  Porter required L.C. to agree to
potential customer's "kinky" requests and told her to do whatever
they wanted.  (Id.)

        During the time he exploited L.C., Porter arranged for his
mother to babysit L.C.'s three-year-old son.  (Ex. 5, p. 64-65.)  On
those occasions when Porter's mother was unavailable, L.C.'s son was
brought to the hotels where Porter was prostituting L.C. and other
victims.  (Id.)  When L.C. was servicing a customer, her child was
supervised by other victims.  (Id.)  In July 2011, L.C. tried to
escape.  (PSR ¶ 18.)  Porter followed L.C., texting "I know where you
live, I know where your parents live, I know where your son goes to
school."  (Id.)  L.C. returned and tried to reason with Porter.  When
she informed him that she genuinely wanted to leave, he responded by

5

grabbing her, throwing her into the bathroom[1] and told her, "You're not leaving.  You're going to stay here, open up your legs and make my mother fucking money."  (Id.)  Porter proceeded to slap L.C. in the face and pin her against the wall and told her, "You're not going anywhere.  Please don't get [this] shit twisted...I run this mother-fucking show. . . I'm a real hood nigger."  (Ex. 5, p. 61.)  On another occasion, Porter tackled L.C., picked her up by her hair and slapped her and said, "Dumb bitch, I don't give a fuck what you think, what you say, how you feel. It's not your show, it's my show." (Ex. 5, p. 63.)

L.C. reported that after Thanksgiving 2011, Porter perceived her to "have an attitude" while dining at a restaurant.  (Ex. 5, p. 62.) When they returned home, Porter ordered L.C. to strip naked and used the electrical cord of her hair straightener to whip her on her buttocks and legs, leaving raised welts and bruises.  (Id.)  A photograph L.C. took of her injuries is attached as Exhibit 6.  A photograph of the hair straightener is attached as Exhibit 7.  In addition to subjecting L.C. to violent coercion, L.C. witnessed Porter strike N.G.  (Id.)

L.C. averaged 5-6 clients a day, some days 1-2, other days 10 or more, giving all of her earnings to Porter.  (Ex. 5, p. 65-66.)  A few months before the April 2012 vice operation which led to Porter's arrest, Porter declared that the women would not work on Sundays in

---

[1]     L.C. (and numerous other victims) recounted that Porter frequently took his victims to the bathroom when he intended to assault them to that the other victims did not see the abuse, although the telltale sounds of physical and verbal abuse were evident.

1   order to "give God his due." (Id.)   This practice lasted one week,

2   before Porter announced that he was losing too much money and

3   returned to working his victims 7 days per week. (Id.)

4       K.M. (PSR ¶ 20)

5       K.M. provided the following information during her interviews

6   with law enforcement.  The redacted FBI 302s are attached as Exhibit

7   8.

8       K.M. left Porter in December 2011 and was unemployed. (PSR ¶

9   20.)  Desperate for money, K.M. contacted Porter in March 2012 and

10  asked to work for Porter with the understanding that they would split

11  the proceeds 50/50.  (Ex. 8, p. 93.)  K.M. stayed with Porter for a

12  week and a half, during which time Porter took all of the money K.M.

13  earned and also took control of K.M.'s car keys to prevent her from

14  leaving, took away her cell phone to prevent her from contacting

15  anyone.  (Id.)

16      The incident described in the PSR in which Porter required K.M.

17  to sit on her hands so that he could backhand her in the eye, PSR at

18  ¶ 20, occurred when Porter was going through K.M.'s cell phone and

19  became angry after seeing a text from a former boyfriend.  After

20  striking K.M. in the face, she said, "How dare you?" to which Porter

21  replied, "[N.G.] and [L.C.] they can take it.  They can take it like

22  a man." (Ex. 8, p. 92.)  On other occasions, K.M. had observed

23  Porter strike L.C. and choke N.G.  (Ex. 8, p. 91-92.)

24      K.L. (PSR ¶ 21)

25      K.L. provided the following information during her interviews

26  with law enforcement.  The redacted FBI 302s are attached as Exhibit

27  9.

28

7

K.L. was introduced to Porter by his Uncle Buck.  (Ex. 9, p. 97.)  K.L. feared Porter and believed that is she did not do as he directed, she would end up dead.  (Ex. 9, p. 98.)  In March 2012, N.G. surreptitiously recorded K.L. arguing with Porter about the 50% cut he promised her.  The recordings include Porter stating:

"I field my hustle for you to work at least $1,000 a day.  So how much did you make today?  How much you make?  $680.  That means you owe me $340 … because my time is money … You talkin' too much you gonna make me go off.  I don't give a fuck about you or your friends … I run the motherfuckin' show."

"If some motherfucker come in here to hurt you, who will come in here and save you?  Cause if you get 50%, I'm not comin' in.  The motherfucker try to hurt you, I'm not coming in.  I expect you to handle 50% of your ass in that motherfuckin situation … Fuck 50% I don't want no bitch with me that want 50%! … It's a billion people on this planet.  But there's one nigger I don't' want you to talk crazy to, and that's me."  (See Criminal Complaint, Docket Entry #1.)

M.M. (PSR ¶ 22)

M.M. provided the following information during her interviews with law enforcement.  The redacted FBI 302s are attached as Exhibit 10.

Porter set the fees for the sex acts M.M. performed: $100/15 minutes; $300/hour, and collected the money from M.M. after the customers departed.  (Ex. 10, p. 108.)

M.M. reported to Porter that she was feeling sad and trapped in her situation.  (Id.)  According to M.M. Porter responded, "At least I don't beat you and I feed you."  (Id.)

8

As noted in the PSR, Porter's written rules included that M.M and N.G had to get into bed naked with Porter every night and had to have sex with Porter whenever he wanted. (PSR ¶ 22.)  M.M. estimated that she was required to have sex with Porter on a daily basis.

Also noted in the PSR, Porter required that M.M. withdraw all of the money in her bank account.  The withdrawal constituted all of M.M.'s savings and totaled approximately $7000.00.  (Ex. 10, p. 110.)

When M.M. left Porter and returned home, her parents were so concerned with her mental distress that they called an ambulance and M.M. was admitted to the hospital.  (Id.)  Since leaving Porter, M.M. has suffered delusions and attempted suicide.  (Ex. 10, p. 113.)

C.T. (PSR ¶ 23)

C.T. provided the following information during her interviews with law enforcement.  The redacted FBI 302s are attached as Exhibit 11.

C.T. was 19 years old and working as a receptionist at a car dealership in rural Colorado when she responded to Porter's fraudulent online posting seeking a romantic relationship.  (Ex. 11, p. 115.)  Porter convinced C.T. that he was a wealthy businessman and would give her a luxurious place to live and a job working in his athletic footwear company if she moved to Southern California.  (Id.) C.T., a naïve young woman, rejected the advice of family and friends that Porter's offer was too good to be true and accepted the one-way ticket Porter sent her to fly from Denver to John Wayne Airport. (Ex. 11, p. 111.)  A poignant photo of a smiling and excited C.T. with her father on the day she departed Colorado is attached as Exhibit 12.

When C.T. landed at John Wayne Airport, Porter picked her up and

immediately drove her to a nearby hotel where he made clear that all of his representations to lure her to California were false and that she would be prostituting for him.  (PSR ¶ 23.)  Porter bought C.J. lingerie, photographed her for online prostitution postings, and required her to prostitute.  (Id.)  C.T. resisted and Porter forced her to engage in intercourse with him.  (Id.)  After a few days, C.J. escaped from the hotel and found her to way to John Wayne Airport.  (Id.)  There, security personnel found C.T. crying in a bathroom stall.  (Id.)  Initially, C.J. was too ashamed and overwhelmed to disclose her victimization to local law enforcement, but described Porter's exploitation of her in detail to the FBI in detail.  (Ex. 11, p. 115-121.)

C.H., A.H. and N.C. (PSR ¶¶ 24-27)

Investigation of this matter revealed additional victims, C.H., A.H. and N.V. identified at PSR ¶¶ 24-27.  While not named in the eight counts of the indictment, these victims also suffered Porter's abuse and control.  The redacted FBI 302s are attached as Exhibit 13.

As noted in the PSR, C.H resisted having sex with Porter, PSR ¶ 24, but Porter required it in order to "[s]ee if [she] had the nerves to do this job."  (Ex. 13, p. 126.)  Afterward, Porter told her, "If you could do it with me, you can do it with everyone."  (Id.)

III. GUIDELINES CALCULATIONS

Although the Sentencing Guidelines are but one of several factors for the Court to consider in fashioning a just sentence, the Supreme Court has mandated that "district courts must treat the Guidelines as the 'starting point and the initial benchmark.'" See Kimbrough v. United States, 552 U.S. 85, 108 (2007)(quoting Gall v.

10

1    <u>United States</u>, 552 U.S. 38, 49 (2001).  Here, the PSR correctly

2    calculated a total offense level of 36, applying U.S.S.G. §§ 2X1.1

3    and 2G.1.1 for a base offense level of 34, correctly increasing the

4    offense level by five levels to account for the number of victims,

5    pursuant to U.S.S.G. § 3D1.4, and applying the appropriate three-

6    level downward adjustment for acceptance of responsibility. PSR

7    ¶¶ 31-46.  In his plea agreement, Porter agreed that the above

8    calculation was correct. (Plea Agreement at 10).

9         <u>Criminal History</u>

10        The government submits that the defendant's criminal history was

11   correctly calculated by Probation as Category III and this fairly

12   characterizes the defendant's prior criminal conduct.

13        Porter's criminal history includes three convictions for

14   assaultive conduct.  Two of the convictions involve May Moua, the

15   mother of Porter's children, who has pleaded guilty to misprision in

16   connection with this matter.  In 1999, Porter was convicted of

17   threatening Moua in connection with a report that the threat involved

18   a baseball bat, which was found at the scene.  (<u>See</u> Exhibit 14.)  In

19   2003, Porter was convicted of battery in connection with a report

20   that he punched Moua in the head and pulling her hair.  (<u>See</u> Exhibit

21   15.)  Porter bragged to N.G. that he had a domestic violence

22   conviction involving May for "kicking her ass."  (Ex. 2, 31.)

23   Further, the PSR describes a 1999 conviction for disturbing the

24   peace, in which Porter reportedly assaulted an individual by placing

25   him in a chokehold and forcing him to the ground.  (PSR ¶ 51.)  This

26   criminal history reflects a continuous pattern of violent conduct

27   (threats, punching, slapping, chokeholds) which, regrettably, are

28

1   consistent with the types of violence described by the sex
2   trafficking victims.

3       The defendant's three prior convictions for driving while
4   suspended are traffic offenses and have been accorded the appropriate
5   weight by Probation (1 point for the 2002 conviction, resulting in a
6   sentence of 36 months probation).  (PSR ¶¶ 50, 52, 54.)  More than
7   the substance of these offenses, it is significant that Porter
8   violated probation on all of his convictions except his conviction
9   for threats.  (PSR ¶¶ 50-55.)  These multiple violations of probation
10  noted are indicative of a disregard for the court's authority and
11  undermine Porter's assertion that the minimal five-year period of
12  supervised release, is appropriate.

13  **FACTORS UNDER 18 U.S.C. § 3553(a)**

14      Title 18, United States Code, Section 3553(a), provides that the
15  court shall consider the following factors when determining a
16  sentence:  (1) the nature and circumstances of the offenses; (2) the
17  history and characteristics of the defendant; (3) the need for the
18  sentence to reflect the serious of the offenses to promote respect
19  for the law and to provide just  punishment for the offense; (4) the
20  need for the sentence to afford adequate deterrence to criminal
21  conduct; (5) the need for the sentence to protect the public from
22  further crimes of the defendant; (6) the need to provide the
23  defendant with education and vocation training, medical care, or
24  other correctional treatment in the most effective manner; (7) the
25  kinds of sentence available; (8) the need to avoid unwarranted
26  sentence disparities among defendants with similar records who have
27  been found guilty of similar conduct; and (9) the need to provide
28

12

1  restitution to any victims of the offense.

2       With respect to the nature of the offense under 3553(a) factor

3  one, the defendant used violence, threats of violence, fraud,

4  coercion and exploitive means to compel the victims to prostitute for

5  his financial benefit and to gratify his sexual desires.  The

6  descriptions of physical violence, verbal abuse, debasement and

7  exploitation provided in the PSR and augmented by information

8  supplied in this Response, speak volumes as to the depraved nature of

9  the defendant's conduct.

10      With respect to factor two, the defendant has a history of

11 violent, assaultive conduct, and violations of probation, evincing a

12 lack of respect for women and for the authority of the court.

13      Factors three, four and five provide that the sentence should

14 provide just punishment while promoting respect for the law, ensuring

15 the safety of the public and deterring similar crimes.  There is a

16 strong need to deter this predatory exploitation, violence and abuse

17 of young, vulnerable women who are forced into sex trafficking.

18 Pimps need to understand that they will face stiff penalties when

19 they lure young women into sexual exploitation.  Further, in this

20 case, there is a real need to promote respect for the law, as the

21 defendant has shown contempt for it in this case and throughout his

22 adult life.

23      With respect to 3553(a) factors six and seven, there is no

24 indication that the defendant needs special medical care beyond that

25 which is provided by the Bureau of Prisons.  PSR at ¶¶ 69-77.

26      Factor eight directs the Court to avoid unwarranted disparity

27 among similarly situated defendants.  Porter is not similarly

28

1  situated to defendants Horn, who was sentenced to 78 months, or

2  Francois, who has not yet been sentenced.

3      Horn was Porter's would-be pimp protégé.  Horn coveted Porter's

4  success and sought, without much success, to copy Porter's "business

5  model."  Within the Porter scheme, Horn was a co-conspirator who

6  recruited victims for Porter to exploit.  While such actions were, of

7  course, reprehensible, they are not equivalent in scope and breadth

8  to Porter's sex trafficking scheme.

9      Similarly, comparing Porter's conduct to that of Francois does

10  not aid in fashioning an appropriate sentence.  Francois is culpable

11  for recruiting victims into Porter's clutches, transporting victims

12  at Porter's behest, and being present at hotels where Porter's

13  victims were prostituted to intimidate them and, thus, prevent them

14  from leaving.

15      Porter's conduct stands apart from that of his co-defendants and

16  warrants independent evaluation.  Porter was the mastermind of a

17  criminal, sex trafficking enterprise.  He studied, developed, and

18  executed a criminal plan, using fraud, force and coercion to prey

19  upon vulnerable women and exploit them for his considerable profit

20  and personal sexual gratification.  His conduct substantially harmed

21  his many victims and resulted in lasting harm to them and their

22  families.  For a period of almost two years, Porter engaged in

23  calculated profiteering by enslaving and prostituting his victims.

24  While Porter's scheme relied, in some measure on the supporting roles

25  played by Horn, Francois and others, this was truly a villainous

26  drama in which Porter cast himself in the starring role.

27      For purposes of § 3553(a), it is of no consequence that Porter

28

14

offers an isolated list of defendants, some of whom who have received
sentences below the applicable guidelines range for a wide range of
criminal conduct and one who engaged in similar conduct to Porter
albeit two victims as opposed to Porter's ten victims, who received a
sentence of 210 months imprisonment. See Def. Memo at 15-16.  The
sentence in this matter, as in all matters, must be appropriately
tailored to the specific characteristics of the offense and the
defendant.  "It has been uniform and constant in the federal judicial
tradition for the sentencing judge to consider every convicted person
as an individual and every case as a unique study in the human
failings that sometimes mitigate, sometimes magnify, the crime and
the punishment to ensue.  Gall v. United States, 552 U.S. 38,
52(2007)(quoting Koon v. United States, 518 U.S. 81, 113 (1996)).
The fact that other defendants convicted of different conduct does
not create an "unwarranted" sentencing disparity.  Moreover,
sentencing disparity is only one factor a court considers in crafting
an individualized sentence under § 3553(a).  See United States v.
Marcial-Santiago, 447 F.3d 71, 719 (9th Cir 2006)("Even if this
[sentencing] disparity were assumed to be unwarranted, however, that
factor alone would not render Appellants' sentence unreasonable; the
need to avoid unwarranted sentencing disparities is only one factor a
district court is to consider in imposing sentence.")  This Court
should need not, and as a practical matter cannot, compare a proposed
sentence to the sentence of every criminal defendant who has been
convicted of sex trafficking.  Too many factors dictate the exercise
of sound sentencing discretion in a particular case.  See Wayne R.
LaFave et al. Criminal Procedure § 26.3(a)(5th ed. 2009)

1  ("Deterrence, incapacitation, and even retribution may require a
2  judge draw distinctions between offenders who commit the same
3  crime.")

4      Porter was the mastermind of a criminal enterprise who compelled
5  numerous, vulnerable women to surrender their bodies for his
6  considerable profit and personal sexual gratification.  Porter's
7  callous and calculated conduct robbed his victims of their freedom,
8  dignity, and the proceeds of the illicit activities he compelled them
9  to perform.  For a period of almost two years, Porter engaged in
10  calculated profiteering by enslaving and prostituting his victims.

11      Horn was a recruiter for Porter's sex trafficking operation.
12  Horn sought, with little success, to copy Porter's "business model."
13  While Horn's actions were reprehensible, his conduct did was that of
14  a wannabe, and of considerably lesser scope than Porter's.
15  Similarly, comparing Porter's conduct to that of Francois does not
16  aid in fashioning and appropriate sentence.  Like Horn, Francois, is
17  culpable for recruiting victims into Porter's clutches, transporting
18  victims at Porter's behest, and being present at hotels where
19  Porter's victims were prostituted to intimidate them.  Again, such
20  conduct is vile, it is readily contrasted with the calculated
21  violence, threats, manipulation and control Porter exercised over his
22  victims.  While Porter's scheme relied, in some measure on the
23  supporting roles played by Horn, Francois and others, this was truly
24  a villainous drama in which Porter cast himself in the starring role.

25      In summary, with respect to the 3553 factors, there are no
26  factors or combination of factors that warrant a sentence outside the
27  sentencing guidelines.
28

1    Based on the analysis of the factors under 18 U.S.C. § 3553, the

2    government's commitment under the Plea Agreement, and the heinous

3    nature of this crime, the government recommends a sentence of 235

4    months in prison, to be followed by a period of supervised release

5    for 10 years.  The supervised release conditions should include,

6    along with the standard and special conditions recommended by

7    Probation, no direct or indirect contact with any of the victims and

8    witnesses in this case, sex offender registration and treatment, and

9    all the other requirements under the Adam Walsh Act, as well as

10   payment of restitution totaling $866,244.68, as discussed below.

11   IV.  MANDATORY RESTITUTION

12       The law mandates restitution to victims in cases "in which an

13   identifiable victim has suffered a physical injury or pecuniary

14   loss."  18 U.S.C. § 3663A(c)(1)(B).  In addition, the defendant's

15   conviction for violating 18 U.S.C. § 1594(c) triggers the mandatory

16   restitution provisions under 18 U.S.C. § 1593, which provides in

17   relevant part:

18           § 1593.   Mandatory restitution

19           (a) Notwithstanding section 3663 or 3663A and in addition

20       to any other civil or criminal penalties authorized by law, the

21       court shall order restitution for any offense under this

22       chapter.

23           (b)(1) The order of restitution under this section shall

24       direct the defendant to pay the victim (through the appropriate

25       court mechanism) the full amount of the victim's losses, as

26       determined by the court, under paragraph (3) of this subsection.

27       . . .

28

1          (3) As used in this subsection, the term "the full amount

2        of the victim's losses" has the same meaning as provided in

3        section 2259(b)(3) and shall in addition include the greater of

4        the gross income or value to the defendant of the victim's

5        services or labor or the value of the victim's labor as

6        guaranteed under the minimum wage and overtime guarantees of the

7        Fair Labor Standards Act (29 U.S.C. 201, et seq.). . .

8    V.   AMOUNT OF LOSS

9        In support of its request for restitution, the government

10   attaches Exhibit 16, summarizing the restitution calculations for

11   each victim, Exhibit 17 summarizing the restitution calculations

12   based on the value to defendant of the victims' services/labor, and

13   Exhibit 18 summarizing the value of the victim's labor as guaranteed

14   under the Fair Labor Standards Act.  The restitution calculations at

15   Exhibit 17 were made using the following methodology.

16       For each victim, the time period provided by the victim was

17   used.  When a precise time period was not provided, the time period

18   was determined based upon a review of Backpage.com advertisements,

19   using the earliest and latest advertisements to define the time

20   period.  For each victim, the number of weeks covered in the time

21   period, using an average five day workweek, was used.  For each

22   victim, the calculation is based upon the average charge for 15

23   minutes of service (the lowest figure), based upon a review of fees

24   advertised on Backpage.com.  The number of customers per day was

25   calculated based upon the average provided by the victim.  When an

26   average was not provided, the calculation was based upon the

27   estimates provided by other victims.  An example of the methodology

28

as applied is as follows:

Victim A

    Period:   4 months = 16 weeks x 5 days/week = 80 days total.

    Rate:    $100 (average)

    Number of customers:  5 customers/day

    Calculation:   80 days x 5 customers/day x $100/customer = $40,000.
Where applicable, the calculations include the additional amounts
Porter took from the victims (e.g., $4300 which Porter required N.G.
to relinquish; $7000 which Porter required M.M. to relinquish).

## CERTIFICATE OF SERVICE

I am a citizen of the United States and resident or employed in Orange County, California. I am over 18 years of age, and I am not a party to the above-entitled action. My business address is the United States Attorney's Office, Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Suite 8000, Santa Ana, California 92701.

On this date, **February 6, 2015**, I served a copy of the foregoing document(s), described as follows: **GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT PORTER'S SENTENCING MEMORANDUM**

in the following manner:

☒by placing a true copy in a sealed envelope, addressed to the person specified below, and placing it for interoffice delivery within the courthouse:

> **Kathleen Peralta, U.S.P.O.**
> **U.S. Probation Office**
> **411 W. 4th Street, Suite 4170**
> **Santa Ana, CA 92701**

by placing the document in a sealed envelope, addressed as follows and with postage placed thereon, and placing it for delivery via the U.S. Postal Service:


I declare under penalty of perjury that the foregoing is true and correct, executed on **February 6, 2015**, at Santa Ana, California.




LINDA LEWIS