**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING**

```
UNITED STATES OF AMERICA,        )
                                 )
            PLAINTIFF,           )
                                 )
        VS.                      ) SACR NO. 12-00097-JLS
                                 )
ROSHAUN NAKIA PORTER,            )
                                 )
            DEFENDANT.           )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, FEBRUARY 20, 2015

10:30 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**TRANSCRIPTS@DDPARKER.COM**

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                    ANDRE BIROTTE, JR.
                    UNITED STATES ATTORNEY

                    DENNISE D. WILLETT
                    ASSISTANT UNITED STATES ATTORNEY
                    CHIEF, CRIMINAL DIVISION

                    SANDY N. LEAL
                    ASSISTANT UNITED STATES ATTORNEY
                    UNITED STATES DISTRICT COURT
                    8000 RONALD REAGAN FEDERAL BUILDING
                    SANTA ANA, CALIFORNIA 92701
                    (714) 338-3500

                    DANIEL H. WEISS
                    UNITED STATES DEPARTMENT OF JUSTICE
                    CIVIL RIGHTS DIVISION
                    SPECIAL LITIGATION
                    SECTION PHB
                    950 PENNSYLVANIA AVENUE NW
                    WASHINGTON, D.C. 90530
                    (202) 307-6264

    FOR THE DEFENDANT, ROSHAUN NAKIA PORTER:

                    KATE CORRIGAN
                    CORRIGAN & WELBOURN, APLC
                    4100 NEWPORT PLACE
                    SUITE 550
                    NEWPORT BEACH, CALIFORNIA 92660
                    (949) 251-0330

```
 1    SANTA ANA, CALIFORNIA; FRIDAY, FEBRUARY 20, 2015; 10:30 A.M.
 2                          -OOO-
 3             THE CLERK:  CALLING CALENDAR ITEM NO. 2,
 4    SACR 12-0097(A)-JLS, UNITED STATES OF AMERICA VERSUS ROSHAUN
 5    NAKIA PORTER.
 6             COUNSEL, YOUR APPEARANCES, PLEASE.
 7             MS. LEAL:  GOOD MORNING, YOUR HONOR.
 8             SANDY LEAL, ON BEHALF OF THE UNITED STATES.
 9             MR. WEISS:  GOOD MORNING, YOUR HONOR.
10             DANIEL WEISS, ON BEHALF OF THE UNITED STATES.
11             THE COURT:  GOOD MORNING.
12             MS. CORRIGAN:  GOOD MORNING, YOUR HONOR.
13             KATE CORRIGAN, ON BEHALF OF MR. PORTER.  HE'S
14    PRESENT AND IN CUSTODY.
15             I ALSO WANT TO ACKNOWLEDGE SOME PEOPLE THAT ARE IN
16    THE AUDIENCE, IN HIS SUPPORT.  I'VE GIVEN THE LIST OF
17    SPELLINGS TO YOUR COURT REPORTER:  PATRICIA PATTON, MAY
18    MORA, RAYMOND PORTER, YOLANDA WILSON, PETER JONES,
19    LAVON PATTON, JOHN WILLIAMS, PAMELA WHITE-EZENWA, SHAWN
20    WALTON, SANDRA PHILLIPS, MONICA MARONE, MARIO COLE AND ROSA
21    BRAXTON.
22             THE COURT:  THANK YOU.
23             ALL RIGHT.  THIS IS THE TIME SET FOR SENTENCING IN
24    THIS CASE.  SO I'VE READ AND CONSIDERED THE PRESENTENCE
25    REPORT THAT WAS DISCLOSED ON SEPTEMBER 15TH OF 2014, ALONG
```

```
 1   WITH THE ADDENDUM TO THE REPORT THAT WAS FILED ON
 2   FEBRUARY 11TH OF THIS YEAR.
 3           LET ME LIST THE OTHER DOCUMENTS THAT I'VE REVIEWED
 4   AND COUNSEL CAN TELL ME IF I HAVE LEFT ANYTHING OUT:  I'VE
 5   READ AND CONSIDERED THE DEFENDANT'S POSITION RE SENTENCING
 6   AND OBJECTION TO CRIMINAL HISTORY CATEGORY, DATED
 7   DECEMBER 28TH OF 2014, INCLUDING THE ATTACHED EXHIBITS; THE
 8   DEFENDANT'S SUPPLEMENT, DATED FEBRUARY 2ND, 2015 AND THE
 9   ATTACHED LETTERS; THE DEFENDANT'S RESPONSE TO THE
10   GOVERNMENT'S POSITION PAPER, DATED FEBRUARY 11TH, 2015 AND
11   THE DEFENDANT'S SUPPLEMENT, DATED FEBRUARY 14, 2015,
12   INCLUDING THE LETTER ATTACHED AS AN EXHIBIT.
13           IT APPEARS THAT I ALSO JUST HAD PLACED IN FRONT OF
14   ME ANOTHER LETTER THAT WASN'T INCLUDED, PRESUMABLY, IN ANY
15   OF THE PRIOR SUBMISSIONS THAT APPEARS TO BE A LETTER FROM
16   MS. PAMELA WHITE-EZENWA; IS THAT CORRECT?
17           MS. CORRIGAN:  THAT IS CORRECT, YOUR HONOR.
18           I RECEIVED THAT LETTER LAST EVENING, BUT I HAD
19   ALREADY LEFT THE OFFICE BY THE TIME I RECEIVED IT; AND SO, I
20   APOLOGIZE FOR NOT FILING IT.
21           THE COURT:  AND IN ADDITION, I HAVE REVIEWED THE
22   GOVERNMENT'S SENTENCING MEMORANDUM THAT WAS FILED,
23   FEBRUARY 6TH OF 2015; THE EXHIBITS 1 THROUGH 19 THAT WERE
24   INCLUDED AND THE GOVERNMENT'S SURREPLY TO THE DEFENDANT'S
25   SENTENCING MEMORANDUM.  AND THAT SURREPLY WAS FILED ON
```

1   FEBRUARY 18TH OF 2015.

2           IS THERE ANYTHING THAT I HAVE FAILED TO LIST THAT

3   I SHOULD HAVE REVIEWED?

4           MS. LEAL:  NO, YOUR HONOR.

5           MS. CORRIGAN:  NO, YOUR HONOR.

6           THE COURT:  ALL RIGHT.  MS. CORRIGAN, HAVE YOU HAD

7   ENOUGH TIME TO READ THE PRESENTENCE REPORT AND THE ADDENDUM

8   AND REVIEW THOSE WITH YOUR CLIENT?

9           MS. CORRIGAN:  YES, YOUR HONOR.

10          THE COURT:  DO YOU HAVE ANY CONCERNS ABOUT HIS

11  ABILITY TO UNDERSTAND THE REPORT?

12          MS. CORRIGAN:  NO, YOUR HONOR.

13          THE COURT:  EXPLAINED IT FULLY TO HIM?

14          MS. CORRIGAN:  I HAVE, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  MR. PORTER, DID YOU HAVE

16  AN OPPORTUNITY WITH THE ASSISTANCE OF YOUR ATTORNEY TO

17  REVIEW THE PRESENTENCE REPORT THAT WAS PREPARED BY THE

18  PROBATION OFFICE IN THIS CASE?

19          DEFENDANT PORTER:  YES, YOUR HONOR.

20          THE COURT:  DID YOU UNDERSTAND THAT REPORT?

21          DEFENDANT PORTER:  YES.

22          THE COURT:  ALL RIGHT.  IS THERE ANY FACTUAL

23  DISPUTE THAT THE DEFENSE WISHES TO RAISE WITH REGARD TO THE

24  PRESENTENCE REPORT?

25          I'M LEAVING ASIDE THE CRIMINAL HISTORY CATEGORY,

1    WHICH I DON'T THINK IS A FACTUAL DISPUTE.

2              MS. CORRIGAN:  CORRECT, YOUR HONOR.

3              YOUR HONOR, THE ONLY THING THAT IS POTENTIALLY OUT

4    THERE IS JUST AT TIMES SOME OF THE DESCRIPTIONS OF WORDS

5    THAT WERE SELECTED BY THE PROBATION REPORT WRITER.  THOSE

6    ARE ISSUES THAT WERE NOT RAISED IN OUR SENTENCING BRIEF, BUT

7    I WILL JUST TELL THE COURT THERE WERE SOME -- I THINK THE

8    EMPHASIS AND THE STYLE OF WRITING WAS AN ISSUE THAT DID

9    STAND OUT, BUT WITH -- BUT WE STAND BY THE FACTUAL BASIS

10   THAT'S CONTAINED WITHIN THE PLEA AGREEMENT.

11             THE COURT:  ALL RIGHT.  IS THERE ANY FACTUAL

12   DISPUTE THAT THE GOVERNMENT WISHES TO RAISE WITH THE

13   PRESENTENCE REPORT?

14             MS. LEAL:  NONE, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  THEN, OTHER THAN REALLY

16   THE TONE OF THE PRESENTENCE REPORT WHICH THE COURT -- I

17   DON'T THINK I CAN ADDRESS IN ANY SPECIFIC MANNER, THE COURT

18   FINDS THAT THE -- IT WILL ACCEPT THE FACTUAL FINDINGS IN THE

19   PRESENTENCE REPORT AS ITS OWN FINDINGS OF FACT, AS THEY ARE

20   NOT IN DISPUTE, OTHER THAN AS I JUST STATED.  SO THE COURT

21   ADOPTS AS ITS OWN FINDINGS THOSE CONTAINED IN THE

22   PRESENTENCE REPORT.

23             NOW, WE TURN FIRST TO THE CALCULATION OF THE

24   GUIDELINES RANGE IN THIS CASE.  THE ADVISORY GUIDELINES ARE

25   THE STARTING POINT.  THEY'RE THE INITIAL BENCHMARK IN THE

1  COURT'S ANALYSIS.  THEY HAVE TO BE KEPT IN MIND THROUGHOUT

2  THE SENTENCING PROCESS.  SO WE CALCULATE THOSE FIRST.

3          AND LET ME ASK -- WITH REGARD TO THE GUIDELINES

4  THAT IS NOT AS TO ANY DEPARTURE OR VARIANCE, BUT JUST THE

5  GUIDELINES THEMSELVES -- DOES THE DEFENSE WISH TO BE HEARD

6  ANY FURTHER ON THAT REGARD?

7          MS. CORRIGAN:  NO, YOUR HONOR.

8          I THINK IT'S ALL ADDRESSED WITHIN OUR PAPERS AND

9  WE'D ASK THE COURT TO ADOPT THESE SENTENCING GUIDELINE

10  CALCULATIONS WITHIN THE PLEA AGREEMENT.

11          THE COURT:  AND AS FOR THE GOVERNMENT?

12          MS. LEAL:  NONE, YOUR HONOR.

13          THANK YOU.

14          THE COURT:  ALL RIGHT.  AND SO, IN REVIEWING AND

15  TAKING INTO ACCOUNT THE 2014 -- NOVEMBER 2014 EDITION OF THE

16  GUIDELINES, THE COURT FINDS THAT WITH THE DEFENDANT'S

17  ACCEPTANCE OF RESPONSIBILITY, THE TOTAL OFFENSE LEVEL IS 36,

18  THE CRIMINAL HISTORY CATEGORY IS III AND -- LET ME TAKE A

19  LOOK -- THE GUIDELINES SENTENCE WOULD BE 235 TO 293 MONTHS.

20  THE GUIDELINES FOR SUPERVISED RELEASE IS FIVE YEARS TO LIFE.

21  THE GUIDELINES RANGE FOR THE FINE IS 20,000 TO $200,000,

22  WITH A MANDATORY SPECIAL ASSESSMENT OF $100.

23          DOES EITHER SIDE DISAGREE WITH THAT CALCULATION OF

24  THE GUIDELINES?

25          MS. LEAL:  NO, YOUR HONOR.

1          MS. CORRIGAN:  NO, YOUR HONOR.

2          THE COURT:  NOW, WE TURN TO THE ISSUE RELATING

3    TO -- THAT WAS RAISED BY THE DEFENSE, RELATING TO CRIMINAL

4    HISTORY AND DEPARTURE, BASED ON CRIMINAL HISTORY.

5          SO IS THERE ANYTHING YOU WOULD LIKE TO BE HEARD

6    FURTHER ON, IN THAT REGARD, MS. CORRIGAN?

7          MS. CORRIGAN:  NO, YOUR HONOR.

8          UNLESS THE COURT HAS QUESTIONS RELATIVE TO THE

9    ARGUMENTS I MADE IN THE SENTENCING POSITION FILED ON

10   DECEMBER 28TH, I THINK THAT IT FULLY ADDRESSES THOSE ISSUES.

11         THE COURT:  I HAVE REVIEWED THAT.  I DON'T HAVE

12   ANY FURTHER QUESTIONS.

13         ANYTHING BY THE GOVERNMENT AT THIS TIME?

14         MS. LEAL:  NO, YOUR HONOR.

15         I BELIEVE WE ADDRESSED IT IN OUR PAPER AND WE

16   AGREE WITH THE ADDENDUM TO THE PSR.

17         THE COURT:  AND THE COURT DOES NOT FIND THAT

18   MR. PORTER'S CRIMINAL HISTORY IS SUBSTANTIALLY OVERSTATED,

19   BECAUSE, FIRST, HE HAS A NUMBER OF MISDEMEANOR CONVICTIONS

20   FOR WHICH HE DID NOT RECEIVE CRIMINAL HISTORY POINTS,

21   INCLUDING TWO WHICH SHOW A PROPENSITY TOWARDS VIOLENCE.

22   WHILE SOME OF THE SCOREABLE CRIMINAL HISTORY POINTS ARE FOR

23   TRAFFIC-RELATED OFFENSES, ONE IS BATTERY.  AS PROBATION

24   NOTED, MR. PORTER DID VIOLATE PRIOR GRANTS OF PROBATION.  HE

25   HAD AN ACTIVE WARRANT AT THE TIME OF THIS OFFENSE, AND HE

1    WAS ON PROBATION ON A FEW CASES AT THE TIME OF THIS OFFENSE.

2         SO, MR. PORTER'S CRIMINAL HISTORY CATEGORY DOES

3    NOT SUBSTANTIALLY OVERREPRESENT THE SERIOUSNESS OF HIS

4    CRIMINAL HISTORY OR THE LIKELIHOOD THAT HE WILL COMMIT OTHER

5    CRIMES, AND THE COURT DECLINES TO DEPART DOWNWARD BASED ON

6    ANY OVERSTATEMENT OF HIS CRIMINAL HISTORY.

7         WITH THAT, THEN WE TURN FROM CALCULATION OF THE

8    GUIDELINES AND ANY DEPARTURES TO A DETERMINATION OF A PROPER

9    SENTENCE, TAKING INTO ACCOUNT ANY ISSUES THAT WOULD ARISE

10   UNDER THE STATUTE § 3553(A).

11        AND IN THAT REGARD, MS. CORRIGAN, IS THERE

12   ANYTHING THAT YOU WOULD LIKE TO PRESENT WITH REGARD TO THE

13   DETERMINATION OF A PROPER SENTENCE IN THIS CASE?

14        MS. CORRIGAN:  YES, YOUR HONOR.  THANK YOU.

15        YOUR HONOR, THE SENTENCE THAT IS BEING REQUESTED

16   BY THE GOVERNMENT AND THAT'S BEING RECOMMENDED BY PROBATION

17   IS PURELY DRACONIAN.  I SAY THAT, BECAUSE I KNOW THE COURT

18   IS WELL AWARE OF THE FILINGS THAT I HAVE SUBMITTED AS TO THE

19   DISPARITY ISSUE.  IN THE MOST RECENT FILING BY THE

20   GOVERNMENT, IT APPEARS THAT THE GOVERNMENT WOULD MINIMIZE

21   THOSE ARGUMENTS, BUT I THINK AT THE END OF THE DAY, WE HAVE

22   TO LOOK AT WHAT IS A JUST SENTENCE IN THIS CASE WHEN WE LOOK

23   ACROSS THE SPECTRUM OF CASES THAT HAVE BEEN ADJUDICATED.

24        NOW, I KNOW THAT NORMALLY, FOR EXAMPLE, IN DRUG

25   CASES, I WOULDN'T CITE STATE COURT CASES.  BUT I THINK IN

1    THIS GENRE OF CASES THAT WE DO, THAT THE STATE COURT CASES

2    ARE VERY RELEVANT, BECAUSE THE HUMAN TRAFFICKING GRANTS AND

3    THAT SORT OF THING AND THE APPROACHES TO THE PROSECUTIONS

4    ARE VERY SIMILAR.  NOW, OBVIOUSLY, SOME OF THEM ARE ACROSS

5    THE STREET IN STATE COURT; SOME OF THEM REMAIN HERE.

6             BUT EVEN IN THE CASES THAT I'VE CITED IN FEDERAL

7    COURT -- AND SOME OF THOSE THIS COURT HAS PRESIDED OVER --

8    THE SENTENCES DON'T COME CLOSE TO COMING ANYWHERE NEAR THE

9    235-MONTH SENTENCE THAT'S BEING RECOMMENDED IN THIS CASE.

10   IN FACT, MOST RECENTLY THERE'S BEEN ANOTHER COURT THAT HAS

11   BEEN REPORTED OUT OF NORTH COURT, WHICH IS THE ORANGE COUNTY

12   SUPERIOR COURT, AND WHERE -- PURSUANT TO A DISPOSITION WITH

13   THE PEOPLE -- THE DA'S OFFICE -- DEFENDANT TILLMAN BROWN,

14   T-I-L-L-M-A-N B-R-O-W-N, WAS SENTENCED TO FIVE YEARS.  AND

15   ACCORDING TO -- I DIDN'T HAVE AN OPPORTUNITY TO LOOK AT THE

16   VISION (SIC) REPORTS OR THE PLEA AGREEMENT, BUT THIS

17   INVOLVED A MINOR AND A 21-YEAR-OLD DEFENDANT, WHO PLED

18   GUILTY TO PIMPING AND TO SELLING A PERSON FOR SEX, FOUR

19   FELONY COUNTS TOTAL.  THE VICTIM, APPARENTLY, ACCORDING TO

20   THE NEWS REPORT, WAS A 14- TO 15-YEAR-OLD HAD WORKED FOR

21   THREE YEARS AS A PROSTITUTE AND HAD HAD SEXUAL INTERCOURSE

22   WITH THE DEFENDANT.  HE HAD, APPARENTLY, ACCORDING TO THE

23   NEWS, MET HER IN LOS ANGELES AND MOVED HER DOWN TO ANAHEIM,

24   BECAUSE IN ANAHEIM THERE'S MORE MONEY TO BE MADE.  HE --

25   IT'S A LITTLE UNCLEAR TO ME WHAT THE TIME FRAME WAS, BUT IT

1    WOULD APPEAR THAT THIS DEFENDANT WAS PIMPING OUT A MINOR.

2    AND I THINK THAT THAT'S SOMETHING THAT'S VERY DISTINCT, IN

3    MANY OF THE CASES THAT I'VE CITED.

4           IN FACT, MR. HORN, THE CO-DEFENDANT IN THIS CASE,

5    AS THE COURT WELL KNOWS, GOT INVOLVED WITH A GIRL FROM OCHA,

6    A LOCAL HIGH SCHOOL RIGHT DOWN THE STREET AND PUT HER OUT

7    THERE, FROM WHAT THE DISCOVERY INDICATED.  ALTHOUGH -- AND I

8    THINK THAT THE GOVERNMENT MISINTERPRETS SOME OF WHAT I'VE

9    PUT IN MY SENTENCING PAPERS, THEY WOULD SUGGEST THAT I'M

10   IGNORING THE SERIOUSNESS OF THE OFFENSE.  I'M BY NO MEANS

11   IGNORING THE SERIOUSNESS OF THE OFFENSE HERE.  BUT WHAT I

12   THINK THAT THEY'RE DISREGARDING AND FOR WHATEVER REASON

13   ASKING THIS COURT TO GIVE MR. PORTER A SENTENCE THAT IS FAR

14   BEYOND SENTENCES THAT WE SEE WHERE THERE'S MUCH MORE

15   EGREGIOUS CONDUCT.  NOW, WE MAY NOT HAVE THE TIME FRAME, BUT

16   WE HAVE CONDUCT WITH CHILDREN.  WE HAVE -- I WILL --

17          I KNOW I DON'T WANT TO BELABOR THE ISSUE.  BUT IN

18   EACH ONE OF MY EXHIBITS THAT I PROVIDED WITH THE COURT, I

19   GAVE A BRIEF FACTUAL BACKGROUND ON THOSE CASES.  MANY OF

20   THEM INVOLVE REPEAT OFFENDERS, STRIKERS, PEOPLE WHO PUT KIDS

21   OUT THERE.  ONE OF THE VICTIMS IS AS YOUNG AS 12 YEARS OLD

22   AND THE PIMP -- ALTHOUGH IT WAS A FEMALE -- SMOKED CRACK

23   COCAINE WITH HER.  AND THE SENTENCES THAT I'VE CITED

24   THROUGHOUT MY PAPERS DON'T COME ANYWHERE CLOSE TO THE 235

25   MONTHS.

```
 1              NOW, I KNOW THAT THE GOVERNMENT WOULD SAY THAT,
 2    OH, WELL, MR. HORN WAS JUST PART OF SOME -- THEY KIND OF
 3    MAKE IT OUT TO WHERE IT WAS LIKE A MOVIE SCENE.  WELL, THIS
 4    IS NOT A MOVIE SCENE.  IT'S NOT A DRAMA.  WHAT WE'RE TALKING
 5    ABOUT IS WHAT WE'RE DOING TO THE FUTURE OF THIS MAN'S LIFE
 6    AND HOW MUCH TIME HE'S GOING TO SPEND IN PRISON.  IT'S NOT A
 7    MATTER OF IF HE'S GOING TO PRISON.  HE IS GOING TO PRISON.
 8    IT'S A MATTER FOR HOW LONG AND WHAT'S FAIR.
 9              BASED ON THE SENTENCES THAT WE'RE SEEING COMING
10    OUT OF COURTS, BOTH IN THIS BUILDING AND STATE COURTS AND
11    OTHER COURTS, THOSE SENTENCES DO NOT EVEN COME CLOSE TO
12    REACHING THE LEVEL AT WHICH THIS -- THE GOVERNMENT IS ASKING
13    THE COURT TO EMBRACE AND TO IMPOSE.
14              I THINK THAT ONE OF THE KEY ELEMENTS HERE -- AND
15    MY CLIENT WILL SPEAK TO THIS A BIT.  BUT MY CLIENT HAS BEEN
16    IN CUSTODY FOR, APPROXIMATELY, THREE YEARS.  AND SOME OF THE
17    OTHER EXHIBITS WILL INDICATE TO THE COURT -- IN PARTICULAR,
18    LETTER FROM OFFICER RUBALCABA, AT THE SANTA ANA JAIL -- THAT
19    THIS DEFENDANT HAS BEEN, ESSENTIALLY, WHAT I WOULD CALL A
20    MODEL PRISONER.  AND I'M GOING TO TAKE A PHRASE FROM
21    JUDGE CARNEY IN THAT HE IS NOT A "PITY PIECE."  I'M NOT
22    TALKING THAT JUDGE CARNEY HAS TALKED ABOUT MY CLIENT, BUT HE
23    USED THAT PHRASE IN A SENTENCING THAT I HAD RECENTLY, THAT
24    SOMEBODY WHO IS BEING PRODUCTIVE AT THE SANTA ANA JAIL FOR A
25    LONG PERIOD OF TIME IS NO "PITY PIECE" AND IS SOMEBODY THAT
```

1    IS SHOWING THAT THEY UNDERSTAND -- THEY COME -- THEY TAKE

2    THE TIME TO BECOME AWARE THAT THEIR CONDUCT IS WRONGFUL AND

3    THAT THEY NEED TO CHANGE THEIR WAYS.

4           OBVIOUSLY, I'M NOT GOING TO STAND HERE AND VOUCH

5    FOR MR. PORTER.  IT'S UP TO HIM TO DO THAT.  HE WILL ADDRESS

6    THE COURT ON THAT.  BUT WE CAN SEE IS A CONTINUUM OF ALMOST

7    A THREE-YEAR PERIOD WHERE HE HAS PARTICIPATED IN CLASSES.

8    HE HAS DONE BIBLE STUDY.  HE HAS VISITED WITH THE CHAPLAIN

9    ON A REGULAR BASIS.  HE HAS TALKED THROUGH ISSUES.  HE HAS

10   HAD TO FACE HIS CHILDREN.  HE'S REALIZED THAT THAT PERIOD OF

11   TIME HAS A RIPPLE EFFECT ON EVERYONE.  NOT JUST HIM, BUT

12   EVERYONE WHO'S SEATED BEHIND US -- 13 PEOPLE ARE HERE AND

13   HIS CHILDREN -- THE VICTIMS OF THIS CASE.  AND THE COURT HAS

14   SEEN THOSE LETTERS.  ALL OF THE CONDUCT HAS HAD A HUGE

15   RIPPLE EFFECT.

16          SO, WHAT THE THREE YEARS HAS SHOWN IS, PERHAPS,

17   THAT HIS IMMEDIATE PAST IS HIS PROLOGUE; I HOPE FOR HIM THAT

18   IT IS.  BECAUSE THE LAST THING HE NEEDS TO DO IS BE BEFORE

19   THIS COURT AGAIN.  BUT HE'S -- HE INDICATES TO ME THAT HE

20   HAS GAINED AN UNDERSTANDING OF THAT.  I THINK, TOO, WHEN WE

21   START TO LOOK -- WE TAKE THE INFORMATION WE HAVE FROM THE

22   SANTA ANA JAIL, THE LETTERS THAT THE MEMBERS -- THE FOLKS

23   THAT ARE HERE IN SUPPORT TODAY PROVIDED, AS WELL AS

24   OTHERS -- HAVE GIVEN A GLIMPSE INTO THAT THERE IS SOMEBODY,

25   A PERSON -- THERE IS A PERSON IN MR. PORTER THAT ISN'T JUST

1    THIS PERSON THAT CONDUCTED HIMSELF THE WAY HE DID DURING THE

2    TWO-YEAR OFFENSE CONDUCT PERIOD.  HE IS SOMEBODY WHO IS

3    REDEEMABLE.  HE HAS BEGUN THAT PROCESS.  AND HE WILL BE

4    INDICATING TO THE COURT LATER THROUGH A STATEMENT, I THINK,

5    THAT HE RECOGNIZES THAT HE DID WRONG AND HE'S NOT INTENDING

6    TO COME BACK.

7            I THINK THE OTHER THING THAT WE NEED TO LOOK AT IS

8    HIS PAST.  FROM A YOUNG AGE -- AND IT'S DOCUMENTED WELL IN

9    THE PSR WHEN WE TALK ABOUT IT.  FROM THE AGE OF FIVE, HE'S

10   MOLESTED.  HE'S NOT MOLESTED JUST ONCE.  HE'S MOLESTED

11   MULTIPLE TIMES.  IN FACT, HE REPORTED AN INCIDENT WHERE

12   SOMEONE PUT A KNIFE TO HIS NECK AND THREATENED HIM.  THESE

13   ARE ISSUES THAT, UNFORTUNATELY, HE SUFFERED AS A KID, AND

14   THAT CONDUCT PERMEATED, I THINK.  IT GIVES ME NO SURPRISE

15   THAT WE ARE HERE.  BECAUSE I THINK TIME AND TIME AGAIN, WE

16   SEE DEFENDANTS WHO HAVE THESE AWFUL THINGS HAPPEN TO THEM

17   WHERE OTHERWISE THEY HAVE OPPORTUNITIES.  THEY'RE GOING TO

18   SCHOOL.  THEY SEEM TO BE DOING WELL.  BUT THEY HAVE THESE

19   MOMENTS IN THEIR LIVES WHERE THEY'RE VICTIMIZED, AND THEN

20   THEY'RE IN THIS COURTROOM -- IN YOUR COURTROOM, OR ANY OTHER

21   COURTROOM.

22           SO WHEN WE TIE THIS ALL TOGETHER, I THINK THAT

23   WHEN WE LOOK AT HIS PERSONAL HISTORY AND CHARACTERISTICS BUT

24   ALSO THE IMMEDIATE HISTORY -- SO WE'VE GOT THE PAST HISTORY

25   AS A KID.  WE HAVE THE OFFENSE CONDUCT AND NOW WE HAVE

1    THREE-YEAR PERIOD OF BEING IN CUSTODY -- THAT WOULD INDICATE

2    THAT HE IS REDEEMABLE.  HE'S ON THAT PATH AND THAT PRONG OF

3    THE 3553(A) FACTOR IS ADDRESSED AND THEN THE PROGRESS OF

4    BEING SATISFIED.

5           WHEN WE LOOK AT THE DISPARITY ARGUMENT, AGAIN,

6    IT'S FULLY BRIEFED.  I'VE KIND OF HIT UPON IT, TOUCHED UPON

7    IT TODAY, BRIEFLY; BUT I KNOW THE COURT IS GOOD ABOUT

8    READING THROUGH EVERYTHING, SO I DON'T WANT TO REHASH IT

9    ALL.  BUT I THINK THAT THERE'S PRIOR -- THERE'S OTHER CASES

10   THAT I'VE POINTED OUT, ARE VERY SIGNIFICANT TO SHOW THE

11   COURT THAT A SENTENCE OF FAR LESS THAN 235 MONTHS IS

12   APPROPRIATE AND THAT A SENTENCE CLOSER TO THE SENTENCE THAT

13   MR. HORN, THE CO-DEFENDANT IN THIS CASE, RECEIVED IS

14   APPROPRIATE, PARTICULARLY, WHEN WE LOOK AT THE HORN CONDUCT

15   AND REALIZE THAT THE HORN CONDUCT INCLUDED AT LEAST ONE

16   MINOR.

17          WE ALL KNOW THAT THE SENTENCING REFORM ACT AND THE

18   CASE LAW TELLS US THAT THE SENTENCE SHOULD BE SUFFICIENT BUT

19   NOT GREATER TO MEET THE GOALS OF THE SENTENCING REFORM ACT

20   AND THAT IT SHOULD BE TAILORED IN A WAY THAT THIS DEFENDANT

21   IS -- ALL OF THE FACTORS AS THEY APPLY TO THIS DEFENDANT

22   SHOULD BE CONSIDERED.  I KNOW THIS COURT DOES THAT.

23          ALL MY CLIENT IS ASKING YOU TO DO TODAY IS TO BE

24   FAIR.  AND THE SENTENCE THAT THE GOVERNMENT IS SUGGESTING OR

25   RECOMMENDING, THE SENTENCE THAT'S BEING RECOMMENDED BY

```
 1   PROBATION, IT'S NOT FAIR.  YOU'RE TALKING ABOUT ALMOST 20
 2   YEARS IN PRISON.  THAT IS NOT IN FAIR.  THE CRIMINAL
 3   HISTORY, IT IS WHAT IT IS.  THE GOVERNMENT WOULD SUGGEST
 4   THAT CRIMINAL HISTORY -- THE CRIMINAL HISTORY HERE IS
 5   TREMENDOUS.  IT'S NOT GOOD.  NO CRIMINAL HISTORY IS GOOD,
 6   BUT A LOT OF IT IS BACK IN THE '90S.  I'M NOT GIVING AN
 7   EXCUSE FOR IT; BUT AT THE SAME TIME, SOME OF THAT CONDUCT IS
 8   OLDER.  HE'S NEVER SPENT A SIGNIFICANT PERIOD IN CUSTODY.
 9   THIS IS THE FIRST TIME THAT THIS HAS HAPPENED.  AS THE COURT
10   KNOWS, HE STARTED OFF IN STATE CUSTODY AND MOVED OVER HERE.
11   SENTENCING ISSUES ARE FAR DIFFERENT OVER HERE.
12         BUT AT THE END OF THE DAY, MY CLIENT IS JUST
13   ASKING THIS COURT TO BE FAIR AND I'M ASKING THIS COURT TO BE
14   FAIR AND TO SENTENCE HIM CLOSER TO THE RANGE OF A SENTENCE
15   TO THE HORN CASE AND TO THE CASES THAT I'VE CITED THROUGHOUT
16   THE TWO BRIEFS THAT I'VE FILED.
17         AND UNLESS THE COURT HAS ANY QUESTIONS, I WILL
18   SUBMIT AT THIS TIME.
19         THE COURT:  I DO NOT HAVE ANY QUESTIONS AT THIS
20   TIME, BUT I WILL HEAR FROM THE DEFENDANT AT THIS TIME.
21         SO, IF MR. PORTER -- SIR, IF YOU HAVE ANYTHING YOU
22   WOULD LIKE TO SAY BEFORE I SENTENCE YOU HERE TODAY, THIS IS
23   YOUR OPPORTUNITY.
24      (PAUSE.)
25         MS. CORRIGAN:  I'M SORRY.
```

| 1 | DEFENDANT PORTER:  GOOD MORNING, YOUR HONOR. |

1        DEFENDANT PORTER:  GOOD MORNING, YOUR HONOR.

2        THE COURT:  GOOD MORNING.

3        DEFENDANT PORTER:  FIRST OF ALL, I JUST WANT TO

4   THANK GOD AND MY LORD AND SAVIOR JESUS CHRIST.

5        THIS HAS BEEN A LONG ROAD TRAVELED, YOUR HONOR.

6   YOU KNOW, THREE YEARS OF MY LIFE, I'VE SPENT HERE AND I'VE

7   HAD TIME TO THINK AND TO ASSESS THE CONDUCT THAT I -- I WAS

8   INVOLVED IN FOR TWO YEARS.  AND NOTHING IN MY LIFE WOULD

9   EVER MAKE ME BELIEVE THAT -- THAT I WOULD COME TO THIS

10  PLACE; YOU KNOW, THAT I WOULD BE A 34-YEAR-OLD MAN, BETWEEN

11  34 AND 36, TRYING TO LIVE A LIFE AS A PIMP.

12       I COULD SAY THAT I HAVE A REASON, BUT I REALLY

13  DON'T.  AND I AM -- I'VE HAD A HARD LIFE, BUT I'VE HAD A

14  GREAT ONE.  MY FAMILY IS -- IS -- I DON'T COME FROM A VERY

15  RICH FAMILY.  MONETARILY, WE DON'T HAVE VERY MUCH.  YOU

16  KNOW, MY MOTHER HAS A TENTH-GRADE EDUCATION, BUT SHE HAS A

17  PH.D. IN THE WORLD OF EDUCATION.  AND MY FATHER IS A

18  HARDWORKING MAN, YOU KNOW.  MY FATHER IS ABSOLUTELY THE BEST

19  MAN THAT I'VE EVER KNOWN IN MY WHOLE LIFE, YOU KNOW; SO IS

20  MY MOTHER.

21       I HAVE A FAMILY THAT -- THAT IS FULL OF LOVE, YOU

22  KNOW.  SO WE WEREN'T RICH IN MONETARY THINGS.  IT WAS

23  REPLACED WITH LOVE, YOU KNOW.  I MEAN, I HAVE MY -- MY

24  MOTHER'S FATHER HAS 55 KIDS.  I HAVE A HUGE FAMILY, YOU

25  KNOW, AS WELL AS ON MY FATHER'S SIDE.

```
 1          I WASN'T RAISED THIS WAY.  NOTHING IN MY LIFE,
 2  NOTHING MY PARENTS TAUGHT ME, WOULD LEAD ME TO THIS POINT IN
 3  MY LIFE.  AND I DON'T KNOW WHERE I WAS LED ASTRAY.  I DON'T
 4  KNOW IF IT WAS ME AND ALL THE DRUGS AND, YOU KNOW.
 5          BUT FROM A YOUNG AGE, YOU KNOW, I REMEMBER LIVING
 6  WITH MY MOTHER AND -- WELL, LET ME SAY THIS:  DURING THE
 7  THREE YEARS, I OFTEN WONDERED, YOU KNOW, ROSHAUN, WHAT GOT
 8  YOU TO THIS POINT?  WHAT MADE YOU ENGAGE IN SOMETHING LIKE
 9  THIS?
10          BECAUSE I WAS RAISED BY MY -- PRIMARILY BY MY
11  MOTHER.  THOUGH I ALWAYS HAD ACCESS TO MY FATHER, I LIVED IN
12  THE HOME WITH MY MOTHER.  I'M HER ONLY SON.  AND MY MOTHER
13  ALWAYS WORKED TO MAKE THINGS HAPPY AND FOOD -- SO FOOD WAS
14  PUT ON THE TABLE SO THAT I HAD AN OPPORTUNITY TO LIVE AND TO
15  EAT AND TO GO TO SCHOOL.  I HAVEN'T -- I DIDN'T KNOW WHAT
16  BROUGHT ME TO THIS POINT, SO FOR THREE YEARS, I THOUGHT
17  ABOUT THIS, YOUR HONOR.  YOU KNOW, I THOUGHT I REALLY HAD TO
18  ASSESS THE SITUATION.  I'VE ALWAYS BEEN A VERY HAPPY PERSON.
19  A VERY JOVIAL SPIRIT.  I LOVE PEOPLE.  I'VE BEEN THAT WAY MY
20  WHOLE LIFE.  ALWAYS THE CAN-DO TYPE OF PERSON, SOMETHING
21  THAT I LEARNED FROM MY FATHER.  HE'S ALWAYS BEEN THE CAN-DO.
22  MY DAD ALWAYS SAID, NEVER SAY CAN'T.  AND I TRULY BELIEVED
23  THAT IN MY SPIRIT.
24          SO WHEN I GOT HERE, I WAS -- I WAS ASKING MYSELF,
25  WHAT BROUGHT YOU TO THIS POINT?  AND I ALWAYS BELIEVED, YOU
```

```
 1   KNOW, THAT I HAD A GOOD LIFE.  BUT WHEN I THINK BACK IN MY
 2   LIFE ABOUT THE THINGS THAT I'VE BEEN THROUGH, I CAME WITH UP
 3   WITH SOME THINGS, THINGS THAT I'VE NEVER REALLY CONFRONTED
 4   IN MY LIFE.  I'VE KIND OF -- I'VE BEEN A KID THAT ALWAYS
 5   KIND OF -- ALWAYS KIND OF JUST SMILED AT EVERYTHING.  I HIDE
 6   BEHIND MY SMILE.  MY JOY IS MY BEST PEACE.  SO THE THINGS
 7   THAT I KIND OF WENT THROUGH GROWING UP, AT FIVE YEARS OLD,
 8   WHILE BEING BABY-SAT BY MY COUSIN -- OLDER COUSIN, HE PUT A
 9   KNIFE TO MY THROAT AND HAD SEX WITH ME.
10        NOW, HOW DOES A FIVE-YEAR-OLD TAKE THAT?  YOU
11   KNOW, I DIDN'T TELL MY PARENTS FOR SO LONG.  I JUST LIVED
12   WITH IT.  AND I EVEN REMEMBERED THE STRENGTH AT FIVE YEARS
13   OLD BEING THAT, YOU KNOW, I CAN GET THROUGH THIS.  I CAN GO
14   ON.  WELL, AGAIN, AT FIVE YEARS OLD, ON THE OTHER SIDE OF MY
15   FAMILY, YOU KNOW, I HAD ANOTHER COUSIN MOLEST ME.  AND I
16   HAVE -- YOU KNOW, MY MOTHER REALLY COULDN'T AFFORD THE
17   REALLY NICE TOYS OR THE REALLY EXPENSIVE ONES, SO, YOU KNOW,
18   HE HAD TOYS I WANTED TO PLAY WITH, SO IT WAS MORE OF A
19   MANIPULATION THING, WHERE THE OTHER ONE WAS MORE OF A
20   FORCEFUL THING.
21        AT 11 YEARS OLD, I HAD A NEIGHBOR MOLEST ME.  IT
22   WAS A WOMAN.  11 YEARS OLD, YOU KNOW, A YOUNG MAN IS KIND OF
23   FEELING HIMSELF.  YOU KNOW, HIS BODY IS GOING THROUGH STAGES
24   AND YOU STARTED (SIC) BECOMING -- YOU KNOW, LIKING GIRLS,
25   AND I THOUGHT IT WAS COOL THAT THIS 22-YEAR-OLD WOMAN WAS
```

```
1    COMING IN AND TOUCHING ME AND MAKE ME PERFORM ORAL SEX ON
2    HER.
3              AT 14 YEARS OLD, I LOST MY VIRGINITY TO A WOMAN
4    THAT WAS 26.  AND I ALWAYS THOUGH THAT THOSE INCIDENTS
5    DIDN'T BOTHER ME.  I WAS STRONG ENOUGH TO GET THROUGH THEM.
6    I REMEMBER MY MOTHER USED TO SEND ME TO THE STORE, YOU KNOW,
7    WITH A NOTE TO BUY HER PACKS OF KOOLS.  MY MOTHER USED TO
8    SMOKE.  SHE DOESN'T SMOKE ANYMORE.  SHE STOPPED BECAUSE OF
9    ME.
10             AND I WAS ABOUT SEVEN YEARS OLD AND BEING RAN OFF
11   THE ROAD, YOU KNOW, WHERE -- A PLACE WHERE I USED TO PUMP
12   GAS FOR QUARTERS.  MOM USED TO LET ME GO ACROSS THE
13   STREET -- THE GAS STATION WAS ACROSS THE STREET -- AND I
14   WOULD PUMP GAS FOR EXTRA CHANGE.  AND I REMEMBER BEING RAN
15   OUT THE PARKING LOT, ALMOST RAN DOWN BY TWO WHITE GUYS
16   CALLING ME A NIGGER AT SEVEN YEARS OLD.  THINGS LIKE THAT
17   REALLY AFFECTED ME.  MY PARENTS DIDN'T RAISE ME IN A
18   RACIALLY DIVIDED HOME.  MY MOTHER'S -- ONE OF HER BEST
19   FRIENDS IS -- WAS A WHITE LADY NAMED ANNA.  AND, OF COURSE,
20   WE DIDN'T SEE COLOR.  OUR NEIGHBORS WERE HISPANIC.  WE LIVED
21   IN A NEIGHBORHOOD FULL OF -- A VARIETY OF DIFFERENT RACES.
22   MY FATHER IS -- IS ONE OF THE MOST NICEST AND OUTGOING
23   PEOPLE YOU'LL EVER -- TYPE OF PERSON YOU'LL EVER MEET.  SO
24   HE'S NEVER REALLY INSTILLED THAT IN MY LIFE.  SO THAT KIND
25   OF AFFECTED ME.
```

1        THEN, YOU KNOW, I REMEMBER TIMES WHERE, YOU KNOW,

2   GROWING UP WHERE WE WERE SO POOR, I HAD TO STAND IN LINE FOR

3   FREE CHEESE AND FREE BUTTER.  I THANK GOD FOR THAT FREE

4   CHEESE AND FREE BUTTER, YOU KNOW.  HAVING OUR LIGHTS BEING

5   TURNED OFF BECAUSE WE DIDN'T HAVE THE MONEY, YOU KNOW; EIGHT

6   YEARS OLD, WALKING TO THE STORE, SEEING A MAN WITH A BULLET

7   HOLE IN HIS HEAD HAD BEEN MURDERED, THINGS AS A CHILD THAT A

8   CHILD SHOULDN'T SEE OR HAVE TO GO THROUGH.  BUT FOR ME, I

9   WAS ALWAYS STRONG AND I ALWAYS BELIEVED THAT BEING STRONG

10  IS -- AND SMILING IS WHERE IT WAS AT.

11       I'M NOT THE SAME PERSON THAT I WAS WHEN I CAME IN

12  HERE.  I DON'T THINK THAT ANY MAN CAN BE.  IF HE IS, THEN

13  HE'S CRAZY.  IF THIS PLACE DOESN'T MAKE YOU WANT TO CHANGE,

14  YOU'LL NEVER CHANGE.  THREE YEARS IN HERE IS A LONG TIME,

15  YOU KNOW, TO BE FIGHTING FOR JUST A CHANCE AT FREEDOM.

16       THE VIOLENCE IN MY LIFE, I ALWAYS WONDERED WHERE

17  THAT CAME FROM.  I'VE BEEN WITH MY GIRLFRIEND FOR 18 YEARS,

18  A WOMAN THAT STUCK BY ME, EVEN THROUGH ME GROWING UP, YOU

19  KNOW, MY TIMES, OF ADOLESCENCE, MEANING TRANSFORMING FROM A

20  BOY TO A MAN.  EVEN THOUGH THAT TRANSFORMATION TOOK A LITTLE

21  LONGER, YOU KNOW, SHE STUCK BY ME, SUPPORTED ME WHEN I

22  WASN'T WORKING, YOU KNOW.  AND I'M WATCHING THE KIDS AND

23  SHE'S GOING TO WORK EVERY DAY.  AND I'M HOPPING ON MY

24  10-SPEED -- RIDING ON MY 10-SPEED, TAKING MY DAUGHTER TO

25  SCHOOL.

1          I REMEMBER BACK WHEN I WAS YOUNG -- AND BY NO

2    MEANS, I REALLY DIDN'T WANT TO BRING THIS UP, BECAUSE THIS

3    IS BY NO MEANS A SHOT AT ANY ONE OF MY PARENTS, BECAUSE I

4    WOULDN'T TRADE MY PARENTS FOR ANYTHING IN THE WORLD.  I LOVE

5    MY PARENTS.  AND, PROFOUNDLY, I LOVE MY PARENTS.  BUT I

6    REMEMBER BEING YOUNG -- AS A YOUNG MAN AND HEARING MY MOTHER

7    AND FATHER FIGHT, YOU KNOW, SEEING THE REPERCUSSIONS OF THE

8    FIGHTING THAT INCUR (SIC) WHILE MY MOTHER AND FATHER WAS

9    BEHIND CLOSE DOORS, HEARING THEM ARGUE.  YOU KNOW, MY MOTHER

10   COMING OUT WITH A BUSTED LIP.  AND LET ME REMIND YOU.  THIS

11   IS WHEN MY FATHER WAS YOUNG, A YOUNG MAN, YOU KNOW, IN HIS

12   EARLY 20'S.  BY NO MEANS IS THIS A REFLECTION OF WHO MY

13   FATHER IS NOW.  BY NO MEANS.  MY FATHER IS A GREAT MAN.  BUT

14   WATCHING THIS GROWING UP, I NEVER KNEW THAT IT HAD AN EFFECT

15   ON ME.

16          SO WHEN I HAVE MY DAUGHTERS -- WHEN I HAVE MY

17   FIRST BABY, MAIAH, ALL OF THIS KIND OF FLOODED BACK INTO MY

18   LIFE, THINKING ABOUT THE MOLESTATION AND THE VIOLENCE.  AND

19   I WAS OFTEN OVERPROTECTIVE OF MY CHILDREN.  THEN SEVEN YEARS

20   LATER, I HAVE ANOTHER DAUGHTER, NAMED KYLIE.  AND WHEN YOU

21   SEE YOUR CHILDREN, THE MOLESTATION COMES OUT EVEN MORE.

22   IT'S AT THE FOREFRONT OF YOUR MIND.  YOU THINK, YOU KNOW,

23   WHAT IF THIS HAPPENS TO MY CHILD?

24          AND I SAY THAT BECAUSE I'M SO SORRY FOR WHAT I'VE

25   DONE TO THESE VICTIMS ON THIS CASE.  THESE GIRLS ENTRUSTED

```
 1   ME WITH THEIR FRIENDSHIP, AND I TOOK ADVANTAGE OF IT.  I
 2   CAN'T EVEN SPEAK TO HOW MUCH THAT'S AFFECTED ME.  YOU KNOW,
 3   THESE GIRLS, THEY DIDN'T DESERVE THAT AT ALL.  NOT ONLY THEY
 4   DIDN'T DESERVE IT, BUT THEIR FAMILIES.  I THINK THAT A LOT
 5   OF US WHEN WE GET ARRESTED WE'RE SORRY BECAUSE WE GET
 6   CAUGHT.  NONE OF US ARE EVER SORRY, YOU KNOW, FOR THE CRIME
 7   WE COMMITTED.  AND, INITIALLY, WHEN I FIRST GOT UP THERE, I
 8   WAS SORRY.  I WASN'T SORRY FOR THE CRIME I COMMITTED WHEN I
 9   GOT CAUGHT.  I WAS JUST MAD AND ANGRY AT THE WORLD BECAUSE I
10   GOT CAUGHT COMMITTING A CRIME.  I WASN'T THINKING, YOUR
11   CRIME AFFECTED THESE PEOPLE'S LIVES.  UNTIL ONE DAY I WAS
12   SITTING IN ANGER MANAGEMENT CLASS AND MY TEACHER SAID TO ME,
13   *WHAT IF THESE WERE YOUR DAUGHTERS?*
14        AND I WENT BACK TO MY CELL, AND I THOUGHT, WHAT IF
15   THESE WERE MY DAUGHTERS?  I HAVE A 17-YEAR-OLD THAT'S --
16   SHE'S STILL 17.  SHE'S NOT 18.  SHE DOESN'T ACT 19.  SHE
17   STILL HAS THE SPIRIT OF A 17-YEAR-OLD CHILD.  SHE COULD
18   EASILY BE TAKEN ADVANTAGE OF.
19        I HAVE A SEVEN-YEAR-OLD.  SHE'S SEVEN.  SHE
20   DOESN'T ACT OLDER THAN SHE IS.  SHE'S STILL A LITTLE GIRL.
21   SHE ENJOYS RIDING SKATEBOARDS AND PLAYING VIDEO GAMES.  AND
22   YOU SHOULD SEE HER FACE WHEN SHE COMES TO VISIT ME.  THOSE
23   THINGS, YOU -- YOU TAKE FOR GRANTED.  AND WHEN I'M SITTING
24   IN MY CELL AND I THINK THESE VICTIMS WERE ONCE SEVEN YEARS
25   OLD.  THEY WERE ONCE 13.  THEY WERE ONCE 17.  THEY HAVE
```

1   PARENTS THAT LOVE THEM LIKE I LOVE MY CHILDREN.  THERE IS NO

2   EXCUSE FOR WHAT I'VE DONE.  NO EXCUSE FOR WHAT I'VE DONE,

3   AND I TAKE 100 PERCENT RESPONSIBILITY FOR MY ACTIONS.  I

4   DON'T WANT TO DIVERT THE RESPONSIBILITY ON ANYONE BUT

5   MYSELF.

6         MY FAMILY HAS GIVEN ME NOTHING BUT LOVE, YOU KNOW,

7   FROM MY BEST FRIEND, MY COUSIN, MY UNCLES, MY FATHER, MY

8   AUNTIE WHO HAS A SPIRIT OF GOLD.  YOU KNOW, I COME FROM A

9   REALLY GOOD FAMILY, SO NOTHING ABOUT MY FAMILY IS SUPPORTIVE

10  OF MY ACTIONS.  THE ACTIONS THAT I TOOK WERE BECAUSE OF ME.

11  NOT BECAUSE OF ANYBODY ELSE.  AND I THINK IT HAD A LOT TO DO

12  WITH ME, THE DRUGS.  WHEN YOU'RE HIGH ALL THE TIME, YOU'RE

13  NOT COHERENT.  YOU CAN'T THINK STRAIGHT.  YOUR MIND IS IN A

14  CLOUD.  MY DAD TOLD ME SOMETHING A LONG TIME AGO.  MY DAD

15  USED TO SMOKE POT; HIM AND MY MOTHER, THAT WAS THEIR DRUG OF

16  CHOICE.  YOU KNOW, I'VE LEARNED THROUGH THEM THAT THEY TRIED

17  OTHER DRUGS AS WELL BUT NEVER STUCK WITH THOSE OTHER DRUGS.

18  POT WAS THEIR DRUG OF CHOICE.  IT SO HAPPENED TO BE MY DRUG

19  OF CHOICE.

20         MY DAD TOLD ME ONE DAY, HE SAID, *POT IS THE DRUG*

21  *THAT LIES TO YOU, SON.*  HE SAID, *IT TELLS YOU, I'M NOT AS*

22  *BAD AS COCAINE.  I'M NOT AS BAD AS HEROIN.  I'M NOT BAD AS*

23  *METHAMPHETAMINES.  BUT ALL THE WHILE, IT'S TAKING YOUR MIND.*

24  *IT'S YOUR TAKING YOUR CONFIDENCE.  IT'S TAKING YOUR ATTITUDE*

25  *TO SUCCEED.  IT TAKES YOUR RATIONALE, YOUR ABILITY TO*

1  *PROCESS THINGS AND COME OUT WITH A JUST VERDICT,* SO TO

2  SPEAK.

3            AND I -- I SMOKED POT ALL DAY EVERY DAY FOR THE

4  LAST 15 YEARS.  WAKING UP IN THE MORNING, I HAD TO BE HIGH

5  TO EAT, GOING TO SLEEP.  YOU KNOW, JUST THE WHOLE TIME.

6  DEALING WITH THE GIRLS ON THIS CASE, ALWAYS HIGH.  IT WAS

7  JUST BAD.  BUT I SAY THAT TO SAY THAT I'M UP HERE, BECAUSE I

8  REALLY DO WANT TO TAKE RESPONSIBILITY.  I DON'T WANT TO -- I

9  TOLD MY LAWYER, I DON'T WANT TO DEVICTIMIZE THESE GIRLS IN

10  ANY WAY.  I REALLY WANTED YOU TO KNOW THAT.  I DO -- NOT

11  JUST BECAUSE IT'S APPROPRIATE.  NOT JUST BECAUSE IT'S

12  POLITICALLY CORRECT TO STAND IN FRONT OF YOU AND SAY, *HEY, I*

13  *TAKE RESPONSIBILITY.  I WANT TO ACCEPT IT.  I WANT THE THREE*

14  *POINTS OFF FOR ACCEPTANCE.*

15            I THINK A LOT OF GUYS JUST DO THAT JUST BECAUSE

16  THEY WANT ACCEPTANCE.  THEY WANT THE THREE POINTS OFF.  THEY

17  WANT THE REDUCTION.  BUT ARE THEY REALLY SORRY?

18            AND I'M JUST STANDING IN FRONT OF YOU TO TELL YOU

19  THAT I'M REALLY SORRY FOR DOING THIS TO THESE WOMEN.  NO

20  MATTER WHAT YOU DECIDE, I'LL NEVER BE BACK.  THIS IS THE

21  LAST TIME FOR ME.  THIS WILL NEVER HAPPEN AGAIN.  I WILL

22  NEVER BE IN JAIL FOR ANYTHING ELSE.  I DON'T EVEN THINK I

23  WILL JAYWALK AGAIN.  I JUST CAN'T DO THIS.

24            YOU KNOW, MY CHILDREN ARE -- THEY'VE SUFFERED A

25  LOT.  AND I LOVE MY FAMILY.  BUT MY CHILDREN, I LOVE.  AND

1    JUST TO SEE, YOU KNOW, HOW MY DAUGHTERS LOOK AT ME WHEN THEY

2    COME SEE ME, AND MY BABY IS, LIKE, *DAD, I WANT -- I WANT TO*

3    *COOK WITH YOU.  I WANT TO PLAY GAMES WITH YOU.*

4         MY OLDER DAUGHTER, SHE'S GOING TO CHRISTIAN

5    CONFERENCES AND TELLING ME HOW GOD IS AFFECTING HER LIFE.  I

6    CAN'T SHARE THOSE MOMENTS WITH HER.  MY DAUGHTER GRADUATES

7    FROM HIGH SCHOOL.  I'VE BEEN VERY ACTIVE IN HER EDUCATION

8    FOR A VERY LONG TIME.  AND TO -- JUST NOT TO BE ABLE TO SEE

9    MY BABY GRADUATE FROM HIGH SCHOOL, IT REALLY BREAKS YOUR

10   HEART.  MY YOUNGEST DAUGHTER, SHE COMES TO ME, *DAD, I GOT*

11   *ALL E'S ON MY REPORT CARD.*

12        TO SEE THAT AND NOT BE ABLE TO BE HOME WHEN SHE

13   GETS HOME AND TO HELP HER WITH HER HOMEWORK, IT BREAKS YOUR

14   HEART.

15        I DON'T KNOW WHAT TO SAY TO YOU TO LET YOU KNOW

16   THAT I REALLY MEAN IT WHEN I SAY THAT I DO APOLOGIZE TO THE

17   COURT, TO THE VICTIMS, TO THEIR FAMILY AND TO MY FAMILY AND

18   MY FRIENDS THAT ARE HERE WITH ME AND SUPPORT ME FOR THEM

19   EVEN HAVING TO BE HERE FOR MY ACTIONS, FOR ME DOING THIS.

20   THIS IS EMBARRASSING TO MY FAMILY.  IT'S EMBARRASSING FOR ME

21   TO STAND UP HERE IN FRONT OF YOU.  I MEAN, THESE ARE THE

22   PEOPLE THAT I LIVE WITH EVERY DAY, THAT I SEE EVERY DAY,

23   THAT I LOVE EVERY DAY.  AND IT'S JUST EMBARRASSING TO BE IN

24   FRONT OF YOU AND THEM HAVING TO -- HAVE TO COME HERE AND

25   SUPPORT ME IN THIS FASHION.

1          SO I JUST THANK YOU FOR LISTENING.  AND, AGAIN,

2     I -- I AM SORRY TO THE VICTIMS.  AND MAYBE ONE DAY WHEN I

3     GET OUT OF HERE, I CAN POSSIBLY DO SOME WORK TO HELP OTHER

4     PEOPLE SO THEY DON'T HAVE TO BE VICTIMIZED BY PEOPLE LIKE

5     THE PERSON THAT I WAS BEFORE I CAME IN HERE.  BECAUSE IT'S A

6     MIND STATE, YOUR HONOR.  SOMETIMES WE LIE TO OURSELF.  WHILE

7     I WAS DOING THIS, I TOLD MYSELF, *IT'S OKAY.  I'M NOT KILLING*

8     *ANYBODY.*

9          BUT YOU DO.  YOU KILL PEOPLE'S SPIRIT.  YOU KILL

10    PEOPLE'S CONFIDENCE, THEIR JOY, YOU KNOW.  YOU MAY NOT KILL

11    THEIR BODY, BUT THEIR SPIRIT, YOU CAN KILL.  AND I

12    UNDERSTAND THAT NOW.  AND I --

13         AGAIN, I AM DEFINITELY DEEPLY SORRY FOR WHAT I'VE

14    DONE TO THESE LADIES.  AND I APOLOGIZE TO THEM.  AND AGAIN,

15    I APOLOGIZE TO MY FAMILY.

16         THANK YOU FOR LISTENING TO ME.

17         THE COURT:  ALL RIGHT.  HAVING HEARD FROM THE

18    DEFENSE COUNSEL, MS. CORRIGAN, AND FROM THE DEFENDANT, LET

19    ME TURN TO THE GOVERNMENT.

20         MS. LEAL, IS THERE ANYTHING YOU WISH TO PRESENT ON

21    BEHALF OF THE GOVERNMENT?

22         MS. LEAL:  YES, YOUR HONOR.

23         *NO EXCUSE FOR WHAT I HAVE DONE.*  THAT'S WHAT THE

24    DEFENDANT REPEATED AT LEAST TWO OR THREE TIMES TODAY.  BUT

25    WHAT THE GOVERNMENT HEARD WAS A LOT OF EXCUSES FOR WHAT HE

```
1    DID.  THE THEMES WERE:  CHILD MOLESTATION, POVERTY, DRUGS,
2    THAT HE WAS LED ASTRAY.
3           THOSE ARE ALL EXCUSES FOR WHAT MR. PORTER DID.
4    WHAT MR. PORTER DID WAS MAKE CHOICES.  AND HE MADE BAD
5    CHOICES.  BUT HE HAD A LOT OF BAD CHOICES OVER A LONG PERIOD
6    OF TIME.  THIS IS NOT AN ISOLATED INCIDENT LIKE SOME OF
7    THESE LETTERS SUGGEST, THAT THIS IS OUT OF NOWHERE,
8    MR. PORTER'S BEHAVIOR; WE'RE ALL SHOCKED AT WHAT HAPPENED.
9           IT'S NOT SHOCKING AT ALL, BECAUSE THERE WAS A LONG
10   HISTORY OF VIOLENCE.  THERE WAS VIOLENCE AGAINST HIS WIFE,
11   MS. MOUA, IN 1999, WITH A BAT; IN 2003, AGAIN, A CONVICTION
12   FOR BATTERY I BELIEVE WITH JOKING.  THIS IS NOT AN ISOLATED
13   INCIDENT.  THIS IS A CHOICE THAT MR. PORTER MADE THAT HE,
14   WAS GOING TO GO ABOUT LIFE, USING COERCION, FORCE,
15   MANIPULATION TO MAKE IT IN THE WORLD.  AND THAT'S WHAT HE
16   DID.
17          HE MADE A CHOICE WHEN HE WAS ABOUT 35, NOT WHEN HE
18   WAS A CHILD SUFFERING ANY TYPE OF CHILDHOOD MOLESTATION.  A
19   35-YEAR-OLD MAN.  HE MADE A CHOICE TO TAKE VICTIM NG AND PUT
20   HER IN A MOTEL FOR 20 DAYS.  20 DAYS, NONSTOP, SERVICING
21   CLIENTS SO THAT HIS POCKETS WOULD BE LINED WITH CASH.
22   THAT'S WHAT HE DID AND THAT'S THE CHOICE HE MADE.  AND HE
23   DID THAT WHILE EVERYBODY WAS AROUND.  HE WASN'T ISOLATED
24   FROM HIS FAMILY.  VICTIM NG WAS, BUT HE WAS NOT.  THAT'S THE
25   CHOICE HE MADE.  HE THEN THREATENED HER WHEN SHE TRIED TO
```

1   LEAVE AND SAID, *I'M GOING TO SEND VIDEOS THAT I HAVE TAKEN*

2   *OF YOU HAVING SEX WITH STRANGERS AND SEND THEM TO YOUR*

3   *FAMILY IN EUROPE.*

4          THAT'S WHAT HE DID WHEN HE SAW THE MONEY POSSIBLY

5   GOING AWAY.

6          HE MADE A CHOICE TO VICTIMIZE LC.  HE MADE VICTIM

7   LC BE SEPARATED FROM HER THREE-YEAR-OLD BOY.  HE SEPARATED

8   HER FROM HER FAMILY.  HIS FAMILY WAS STILL THERE.  BUT SHE

9   WAS SEPARATED SO SHE COULD WORK IN HOTELS TO MAKE MONEY FOR

10  HIM.  THAT'S WHAT HE CHOSE TO DO.  AND WHEN SHE WASN'T

11  COOPERATIVE, WHEN SHE WAS SHOWING SOME ATTITUDE, HE WHIPPED

12  HER.  HE TOOK HER IN THE BATHROOM, LIKE HE DID WITH MANY OF

13  THE VICTIMS IN THIS CASE, AND HE ASSAULTED THEM.  HE DID

14  THAT SO HE KEPT IT QUIET SO THE OTHER VICTIMS DIDN'T SEE.

15  IT WAS ALL A PLAN OF MANIPULATION.  THAT'S WHAT HE CHOSE TO

16  DO.

17          AND HE DIDN'T STICK WITH LOCAL VICTIMS, BECAUSE HE

18  WAS GREEDY.  HE WANTED TO MAKE MORE MONEY.  SO HE WENT

19  ON-LINE AND HE RECRUITED.  HE RECRUITED VICTIMS.  AND HE

20  KNEW WHO TO TARGET, BECAUSE MR. PORTER, ANYTHING THAT I'VE

21  LEARNED IN THIS CASE, IS THE ULTIMATE SALESMAN, THE ULTIMATE

22  CON MAN.  HE WENT ON-LINE TO SUGAR-DADDY UP ON CRAIGSLIST,

23  WOMEN LOOKING FOR MEN.  HE PREYED ON VULNERABLE WOMEN, WHO

24  WERE LOOKING FOR SOMEONE TO TAKE CARE OF THEM, AND HE

25  TARGETED THEM.  AND VICTIM CT WAS OUT THERE IN COLORADO,

1    LOOKING FOR SOMETHING, LOOKING FOR SOME DREAM AS A

2    19-YEAR-OLD, THAT SHE SHOULDN'T BE LOOKING FOR BUT BELIEVED

3    THAT MR. PORTER, THE VERY SUCCESSFUL FOOTWEAR EXECUTIVE WAS

4    GOING TO FLY HER OUT HERE AND TAKE CARE OF HER AND GET HER A

5    GOOD JOB.  AND SO, SHE ACCEPTED THAT PLANE TICKET AND SHE

6    CAME OUT, ONLY TO BE PUT IN A MOTEL AND WORKED LIKE EVERYONE

7    ELSE.

8         HE DID THIS -- HE MADE THIS CHOICE TO DO THIS.  HE

9    MADE THIS CHOICE TO VICTIMIZE CT, A 19-YEAR-OLD WITH

10   PARENTS, A LOVING FAMILY, JUST LIKE MR. PORTER.  THOSE ARE

11   THE CHOICES HE MADE WHILE HIS FAMILY WAS HERE AND WHILE

12   VICTIM CT WAS ISOLATED FROM HER FAMILY.  THANKFULLY, SHE

13   RAN.  THANKFULLY, SHE RAN AWAY.

14        BUT THESE ARE THE CHOICES MR. PORTER MADE.  HE IS

15   NOT A PIMP.  HE IS MUCH MORE THAN A PIMP.  TO ACKNOWLEDGE

16   THAT YOU'RE A PIMP IS NOT REALLY ACCEPTING WHAT HE DID.  HE

17   DID NOT JUST ACCEPT MONEY FOR WOMEN TO MEET WITH OTHER MEN.

18   HE BEAT THEM.  HE MANIPULATED THEM.  HE SOLD THEM ON A DREAM

19   THAT HE WAS GOING TO GET THEM ALL HOUSES, AND THEY WOULD

20   HAVE THAT OPPORTUNITY TO LIVE IN THAT NICE HOUSE WITH THE

21   PICKET FENCE AND THEIR KIDS.  I HEARD THAT REPEATEDLY FROM

22   THESE VICTIMS IN THIS CASE.  THESE ARE THE DREAMS HE SOLD.

23   AND EVERY TIME THEY WERE DOWN AND SAYING THEY COULDN'T DO

24   THIS ANYMORE, HE WOULD SAY, *WE'RE GOING TO GET THERE.  WE'RE*

25   *GOING TO GET THERE.*  THIS IS WHAT MR. PORTER DID.

1          AND THERE'S NO ONE TO BLAME BUT MR. PORTER.  HE

2    WAS NOT LED ASTRAY BY ANYONE.  THESE ARE HIS CHOICES, AS

3    MR. PORTER SAID.  HE HAS A LOVING FAMILY, AN EXTENDED FAMILY

4    ALL THERE.  HE HAD A SUPPORTIVE WIFE WHO HAD SUPPORTED HIM

5    AFTER BEING PHYSICALLY ASSAULTED BY HIM, WHO STILL STOOD BY

6    HIM.  INSTEAD, WHAT DID MR. PORTER DO?

7          HE DRAGGED HER INTO THIS MESS.

8          THE GOVERNMENT'S SENTENCE OF THE LOW-END SENTENCE

9    THE GOVERNMENT IS RECOMMENDED IS APPROPRIATE AND NOT

10   UNWARRANTED IN THIS CASE.  THIS CASE CANNOT BE COMPARED TO A

11   PIMPING AND PANDERING CASE IN STATE COURT.  NONE OF THESE

12   CASES CAN JUST BE COMPARED, BASED UPON THE CHARGE.  WHEN YOU

13   LISTEN TO THE FACTS OF THIS CASE, THE NUMBER OF VICTIMS, YOU

14   DO NOT SEE CASES LIKE THIS WITH THIS NUMBER OF VICTIMS EVERY

15   DAY.  THIS CASE DESERVES A LOW-END SENTENCE.  MR. PORTER IS

16   NOT SIMILARLY SITUATED TO A STATE DEFENDANT WHO'S PLEADING

17   OUT TO PIMPING AND PANDERING WITH ONE MINOR.  HE HAS 10

18   VICTIMS.  TEN VICTIMS, DESCRIBING MANIPULATION, BEATINGS,

19   HORRIBLE THINGS.

20         MR. PORTER IS ALSO NOT SIMILARLY SITUATED TO

21   MR. HORN.  MR. HORN WAS HIS CO-DEFENDANT.  HE WAS PART OF

22   THIS CONSPIRACY.  BUT AS THE COURT KNOWS, MR. HORN, WHILE HE

23   WANTED TO BE LIKE PORTER, DID NOT PHYSICALLY HARM ANYONE.

24   HE WAS A RECRUITER.  HE WANTED TO BE LIKE PORTER.  MAYBE AT

25   SOME TIME, HE WOULD HAVE BEEN DESERVING OF A SENTENCE THAT

1   THE GOVERNMENT IS RECOMMENDING FOR MR. PORTER, BUT HE WAS

2   NOT MR. PORTER AT THAT TIME.

3        THIS SENTENCE REFLECTS THE SERIOUS NATURE OF THE

4   OFFENSE.  I DON'T KNOW -- THE GOVERNMENT COULD GO ON AND ON.

5   ITS PAPERS ARE CLEAR THAT THIS IS A VERY, VERY SERIOUS

6   OFFENSE.  IT WAS A SCHEME OF EXPLOITATION, INVOLVING ABUSE

7   AND VIOLENCE, AND IT DESTROYED LIVES.  LOTS OF LIVES.

8        IT'S DIFFERENT FROM OTHER SCHEMES THAT WE OFTEN

9   SEE IN FEDERAL COURT.  IT WASN'T JUST FOR MONEY.  MR. PORTER

10  MANIPULATED AND COERCED THOSE WOMEN, AND HE SPENT MUCH TIME

11  DOING THAT SO HE COULD GET THEM TO THE POINT THAT HE COULD

12  TRULY MAKE MONEY OFF THEM.  HE WAS A LEADER AND MASTERMIND

13  OF THIS OPERATION.  HE WAS FRONT AND CENTER WITH THE

14  PHYSICAL ABUSE AND THE COERCION IN THIS CASE.

15       THE GOVERNMENT TAKES OFFENSE TO SUGGEST THAT

16  SOMEHOW POVERTY IS THE ANSWER.  POVERTY CAUSED HIM TO DO

17  THIS.  POVERTY HAS NOTHING TO DO WITH THIS, AND IT IS

18  INSULTING TO EVERY CITIZEN IN THIS COUNTRY, WHO AT TIMES

19  HAVE GONE THROUGH POVERTY, TO HEAR THAT POVERTY IS THE

20  EXCUSE THAT CAUSED SOMEONE TO PREY ON OTHERS LIKE THIS.

21       IT IS INSULTING TO SUGGEST THAT DRUGS WAS A

22  COMPLETE FOG, THAT HE HAD NO IDEA THIS WAS GOING ON.  THIS

23  IS YEARS AND YEARS OF MANIPULATING AND USING FORCE AGAINST

24  WOMEN TO MAKE MONEY.

25       *THE NATURE AND CIRCUMSTANCES OF THE OFFENSE*

1     *CLEARLY SUPPORT A LOW-END SENTENCE OF THIS CASE.*

2             DEFENDANT'S CHILDHOOD, HIS PERSONAL CIRCUMSTANCES

3     DO NOT SUPPORT A VARIANCE OF ANY KIND.  AS HE HAS ADMITTED,

4     HE HAS A VERY SUPPORTIVE FAMILY HERE.  LETTERS HAVE BEEN

5     WRITTEN.

6             I WOULD NOTE, THOUGH, THAT THE LETTER FROM MAURICE

7     VALENTINE, ON LONG BEACH UNIFIED SCHOOL DISTRICT LETTERHEAD,

8     WHICH THE GOVERNMENT NOTES, I DON'T BELIEVE THAT THIS IS

9     SUGGESTING THAT LONG BEACH UNIFIED SCHOOL IS SOMEHOW WRITING

10    THIS, ON BEHALF OF MR. PORTER.  BUT THIS INDIVIDUAL REFERS

11    TO HIS ACTIONS AS PIMPING AND PANDERING; AGAIN, NOT

12    UNDERSTANDING WHAT MR. PORTER HAS BEEN DOING ALL THESE

13    YEARS.

14            THE LETTER FROM JOE SACKETT, FROM LONG BEACH

15    POLYTECHNICAL HIGH SCHOOL, AGAIN -- INAPPROPRIATELY, ON LONG

16    BEACH HIGH SCHOOL LETTERHEAD -- SAYS HE'S NOT AWARE OF THE

17    CIRCUMSTANCES.  NOT AWARE OF THE CIRCUMSTANCES.

18            THE LETTER FROM RAYMOND PORTER, HIS FATHER, WHO

19    HAS ALWAYS BEEN THERE FOR HIM, SAYS, *HE HAS NEVER DONE*

20    *ANYTHING TO EMBARRASS OR DISRESPECT ME, PRIVATELY OR*

21    *PUBLICLY.  JUST MADE ONE MISTAKE IN HIS LIFE.*

22            AGAIN, THE GOVERNMENT WONDERS IF MR. RAYMOND

23    PORTER IS EVEN AWARE OF WHAT HIS SON HAS DONE.  IS THIS THE

24    FIRST TIME HE'S UNDERSTANDING IT?  BECAUSE I CAN'T IMAGINE

25    AN ELDER WRITING A LETTER SAYING, *HE'S NEVER DONE ANYTHING*

1    *TO EMBARRASS OR DISRESPECT ME* AND THAT THIS IS HIS ONE

2    MISTAKE.  THIS IS NOT ONE MISTAKE.  THIS IS DESTROYING 10

3    LIVES AND THE FAMILIES OF THE 10 VICTIMS.

4           MS. PATTON, WHO, AS THE COURT CAN SEE FROM THE

5    FILINGS, MS. PATTON RECEIVED A LOT OF MONEY FROM MR. PORTER

6    DURING THE TIME HE WAS ENGAGED IN THIS CONSPIRACY.  TOOK

7    CARE OF VICTIM LC'S THREE-YEAR-OLD WHILE SHE WAS FORCED TO

8    WORK.  SHE REFERS TO THIS AS A PREDICAMENT.  THIS IS NOT A

9    PREDICAMENT.  THIS IS NOT AN EMBARRASSING SITUATION.  *BUT*

10   *HE'S NEVER BEEN A BULLY OR A VIOLENT PERSON.*

11          I DON'T KNOW -- I DON'T KNOW -- I'M HAPPY THAT

12   MR. PORTER HAS FAMILY TO BE THERE FOR HIM WHEN HE'S DONE

13   WITH HIS SENTENCE, BUT I DON'T THINK ANYTHING I'VE READ OR

14   SEEN SUPPORTS ANYTHING BELOW A LOW-END SENTENCE IN THIS

15   CASE.

16          THANK YOU.

17          THE COURT:  MS. LEAL, IS THE GOVERNMENT AWARE OF

18   ANY VICTIM WHO WISHES TO MAKE A STATEMENT HERE IN THE

19   COURTROOM?

20          MS. LEAL:  NO VICTIMS WANT TO MAKE STATEMENTS.

21   THEY ARE PRESENT AND THEY HAVE PROVIDED LETTERS TO THE

22   COURT.

23          THE COURT:  AND I HAVE REVIEWED ANYTHING THAT'S

24   BEEN PROVIDED TO ME IN WRITING.  BUT, OF COURSE, I JUST

25   WANTED TO MAKE SURE AND CONFIRM THAT NO ONE WANTED TO MAKE

1  ANY STATEMENT WHILE HERE IN THE COURTROOM.

2        MS. LEAL:  THANK YOU.

3        THE COURT:  ALL RIGHT.  THE COURT HAS NOW HEARD

4  FROM DEFENSE COUNSEL AND DIRECTLY FROM THE DEFENDANT.  I

5  HAVE HEARD FROM THE GOVERNMENT.  I'VE REVIEWED ALL OF THE

6  SUBMISSIONS TO THE COURT AND GIVEN AN OPPORTUNITY FOR ANY

7  VICTIM TO BE HEARD.

8        SO NOW I WILL STATE THE REASONS FOR THE SENTENCE

9  AND THE SENTENCE ITSELF.  COUNSEL WILL HAVE A FINAL CHANCE

10 TO MAKE LEGAL OBJECTIONS BEFORE SENTENCE IS IMPOSED.

11       THE COURT HAS A RESPONSIBILITY TO IMPOSE A

12 SENTENCE THAT'S SUFFICIENT BUT NOT GREATER THAN NECESSARY TO

13 COMPLY WITH THOSE PURPOSES DESCRIBED IN THE STATUTE,

14 SECTION 3553(A).  IN THAT REGARD THE SENTENCE HAS TO REFLECT

15 THE SERIOUSNESS OF THE OFFENSE.  IT HAS TO PROMOTE RESPECT

16 FOR THE LAW AND PROVIDE JUST PUNISHMENT.  IT HAS TO AFFORD

17 ADEQUATE DETERRENCE AGAINST CRIMINAL CONDUCT AND PROTECT THE

18 PUBLIC FROM FUTURE CRIMES BY THE DEFENDANT.  IT HAS TO

19 PROVIDE THE DEFENDANT WITH NEEDED EDUCATION, OR VOCATIONAL,

20 OR CORRECTIONAL TREATMENT IN AN EFFECTIVE MANNER.

21       IN CONSIDERING THOSE PURPOSES AND THEN IN MAKING

22 AN INDIVIDUALIZED DETERMINATION BASED ON THE FACTS, I ALSO

23 CONSIDER THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE

24 HISTORY AND CHARACTERISTICS OF THE DEFENDANT, THE KINDS OF

25 SENTENCES THAT ARE AVAILABLE, THE GUIDELINE SENTENCING

1   RANGE, PERTINENT POLICY STATEMENTS THAT HAVE BEEN ISSUED BY

2   THE SENTENCING COMMISSION, THE NEED TO AVOID UNWARRANTED

3   SENTENCING DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS

4   THAT HAVE BEEN CONVICTED OF SIMILAR OFFENSES AND ALSO THE

5   NEED TO PROVIDE RESTITUTION TO VICTIMS OF THE OFFENSE.

6          SO LET ME FIRST DISCUSS THE NATURE AND

7   CIRCUMSTANCES OF THIS OFFENSE.  MR. PORTER IS BEFORE THE

8   COURT FOR SENTENCING, HAVING PLEADED GUILTY TO ONE COUNT OF

9   CONSPIRACY TO ENGAGE IN SEX TRAFFICKING BY FORCE, FRAUD, OR

10  COERCION.

11         THE COURT FINDS ALL THREE OF THOSE TO BE

12  APPLICABLE HERE:  FORCE, FRAUD AND COERCION.  SPECIFICALLY,

13  FOR A PERIOD OF AT LEAST TWO YEARS, HE RECRUITED AT LEAST 10

14  WOMEN TO WORK AS PROSTITUTES FOR HIM.  THIS WAS DONE THROUGH

15  VIOLENCE AND THREATS OF VIOLENCE BOTH TO THEM AND TO THEIR

16  FAMILIES.  IT WAS DONE THROUGH GENERAL INTIMIDATION AND

17  THROUGH THAT HE COMPELLED THEM TO REMAIN IN HIS SERVICE.  HE

18  SUBJECTED THEM TO PHYSICAL VIOLENCE, VERBAL ABUSE, SEXUAL

19  EXPLOITATION BY OTHERS AND BY HIMSELF.  IT WOULD TAKE TOO

20  LONG TO IDENTIFY EACH INSTANCE IN WHICH MR. PORTER EXERCISED

21  CONTROL BY VIOLENCE OR INTIMIDATION.  SO SUFFICE IT TO SAY

22  THAT THE RECORD REFLECTS THAT ARE INSTANCES IN WHICH HE TOOK

23  THE VICTIMS' MONEY AND POSSESSIONS, THREATENED TO SEND

24  EXPLICIT PHOTOS TO THEIR FAMILIES IF THEY TRIED TO LEAVE,

25  LEFT MESSAGES THREATENING THE VICTIMS AND THEIR FAMILY, HIT

1    THEM, WHIPPED THEM WITH AN ELECTRICAL CORD ON AT LEAST ONE

2    OCCASION AND RAPED THEM.  IT WOULD BE DIFFICULT TO OVERSTATE

3    THE PSYCHOLOGICAL AND EMOTIONAL DEVASTATION OF THE VICTIMS.

4    THE VIOLENCE INVOLVED HERE IS, CLEARLY, AN AGGRAVATING

5    FACTOR.

6         HE ALSO USED OTHERS -- BOTH FRIENDS AND VICTIMS --

7    TO SUPPORT HIS ILLEGAL CONDUCT; HE, BEING THE MASTERMIND

8    AND, ESSENTIALLY, THE LEADER.  HE INVOLVED THEM IN

9    FUNCTIONS, SUCH AS DRIVING AND TAKING PHOTOS THAT SUPPORTED

10   HIS UNLAWFUL OPERATION.  THE SPECIFIC NATURE AND

11   CIRCUMSTANCES OF THIS LONG-TERM OFFENSE -- THESE "CHOICES"

12   AS THE GOVERNMENT HAS PUT IT -- REFLECTED DEPRAVITY AND A

13   DISREGARD FOR THE DIGNITY OF WOMEN THAT MANDATES A LENGTHY

14   SENTENCE THAT WILL PROTECT THE PUBLIC AND PREVENT FUTURE

15   CRIMES BY THIS DEFENDANT.

16        THE FACT THAT HE HAD DAUGHTERS DURING THIS PERIOD

17   OF TIME AND THAT THE DEPRAVITY OF HIS CONDUCT NEVER EVEN

18   OCCURRED TO HIM, DESPITE OF HAVING DAUGHTERS, UNTIL SOMEONE

19   ELSE BROUGHT THAT TO HIS ATTENTION WHILE HE WAS IN PRISON,

20   JUST FURTHER REFLECTS HIS DISREGARD FOR OTHERS.

21        THE COURT HAS CONSIDERED AND TAKEN INTO ACCOUNT

22   THE DIFFICULTIES OF MR. PORTER'S CHILDHOOD AS REPORTED IN

23   THE PSR RELATING TO CHILDHOOD SEXUAL ABUSE.  THE COURT

24   AGREES WITH THE GOVERNMENT THAT POVERTY AND EVEN SOME DRUG

25   USE IS NO EXCUSE FOR WHAT OCCURRED HERE.  NO JUSTIFICATION.

1    NOT REALLY EVEN AN EXPLANATION.

2         AS FOR DISPARITIES IN SENTENCING, SOME OF THE

3    PRIOR SENTENCES THAT WERE LISTED BY DEFENSE COUNSEL WERE

4    ONES THAT THE COURT IMPOSED AND THEY WERE LESSER SENTENCES.

5    BUT, FORTUNATELY, THE COURT IS AWARE OF THE SPECIFIC NATURE,

6    FACTS AND CIRCUMSTANCES OF THOSE CASES AND FINDS THAT THEY

7    DIFFER DRAMATICALLY FROM THIS CASE; SPECIFICALLY, THE

8    CO-DEFENDANT IN THIS CASE, MR. HORN, DID NOT ENGAGE IN ANY

9    VIOLENCE.  THERE WAS NO REFLECTION OF THAT, WHATSOEVER.  DID

10   NOT LEAD THIS OPERATION.  WAS SIMPLY A FOLLOWER.  AND IN THE

11   COURT'S VIEW WAS, PROBABLY, NOT EVEN FULLY AWARE OF THE

12   VIOLENCE BEING COMMITTED AGAINST THESE WOMEN BY MR. PORTER.

13        SO GIVEN ALL OF THE FOREGOING, THE COURT BELIEVES

14   THAT A 20-YEAR SENTENCE, WHICH IS TOWARDS THE LOW END OF THE

15   GUIDELINE RANGE AND A 10-YEAR PERIOD OF SUPERVISED RELEASE,

16   WILL ENSURE AND IS THE LEAST SENTENCE THAT WILL ENSURE THE

17   SAFETY OF THE PUBLIC, RESPECT FOR THE LAW AND PROVIDE

18   SUFFICIENT DETERRENCE.

19        THEREFORE, I FIND THAT THE FOLLOWING SENTENCE IS

20   REASONABLE AND SUFFICIENT BUT NO GREATER THAN NECESSARY TO

21   COMPLY WITH THE PURPOSES STATED IN 18 UNITED STATES CODE

22   SECTION 3553(A).

23        I AM GOING TO -- AND JUST BEFORE I GIVE THIS

24   SENTENCE, I'M GOING TO DEFER THE RESTITUTION, WHILE THE

25   COURT CALCULATES AND TAKES A LOOK AT WHAT HAS BEEN PROVIDED.

1    I BELIEVE THE GOVERNMENT HAS PROVIDED A SUFFICIENT ANALYSIS

2    AND THE COURT IS LIKELY TO IMPOSE THAT AMOUNT OF

3    RESTITUTION, BUT I'M GOING TO DEFER THE HEARING ON THAT.

4              YES.

5              MS. CORRIGAN:  ACTUALLY, MIGHT I CONFER WITH MY

6    CLIENT ON THIS ISSUE?  HE IS WILLING TO WAIVE A RESTITUTION

7    HEARING ON THE RECORD.

8              I'VE DISCUSSED THIS BRIEFLY WITH MS. LEAL EARLIER

9    TODAY.

10             THE COURT:  ALL RIGHT.  THEN -- ONE MOMENT.  LET

11   ME ASK MY CLERK TO TURN AROUND.

12        *(PAUSE.)*

13             THE COURT:  THEN, THE COURT WILL INCORPORATE THAT

14   TODAY, IF THERE'S NO OBJECTION.

15             ALL RIGHT.  IT IS ORDERED THAT THE DEFENDANT SHALL

16   PAY TO THE UNITED STATES A SPECIAL ASSESSMENT OF $100, WHICH

17   IS DUE IMMEDIATELY.  ANY UNPAID BALANCE SHALL BE DUE DURING

18   THE PERIOD OF IMPRISONMENT AT THE RATE NOT LESS THAN $25 PER

19   QUARTER AND PURSUANT TO THE BUREAU OF PRISONS' INMATE

20   RESPONSIBILITY PROGRAM.

21             IT IS ORDERED THAT THE DEFENDANT SHALL PAY

22   RESTITUTION IN THE TOTAL AMOUNT OF $866,244.68, PURSUANT TO

23   18 UNITED STATES CODE, SECTION 3663(A).  THE AMOUNT OF

24   RESTITUTION WILL BE -- SHALL BE PAID AS SET FORTH ON A LIST

25   THAT WILL BE ATTACHED TO THIS JUDGMENT.  IF THE DEFENDANT

MAKES PARTIAL PAYMENT, EACH PAYEE SHALL RECEIVE

APPROXIMATELY PROPORTIONAL PAYMENT, UNLESS ANOTHER PRIORITY

ORDER OR PERCENTAGE PAYMENT IS SPECIFIED IN THE JUDGMENT.

RESTITUTION SHALL BE DUE DURING THE PERIOD OF IMPRISONMENT

AT THE RATE OF NOT LESS THAN $25 PER QUARTER AND PURSUANT TO

THE BUREAU OF PRISONS' INMATE FINANCIAL RESPONSIBILITY

PROGRAM.  IF ANY AMOUNT OF THE RESTITUTION REMAINS UNPAID

AFTER RELEASE FROM CUSTODY, NOMINAL MONTHLY PAYMENTS OF AT

LEAST 10 PERCENT OF THE DEFENDANT'S GROSS MONTHLY INCOME BUT

NO LESS THAN $100, WHICHEVER IS GREATER, SHALL BE MADE

DURING THE PERIOD OF SUPERVISED RELEASE.  THESE PAYMENTS

SHALL BEGIN 30 DAYS AFTER COMMENCEMENT OF SUPERVISION.

NOMINAL RESTITUTION PAYMENTS ARE ORDERED, AS THE COURT FINDS

THAT THE DEFENDANT'S ECONOMIC CIRCUMSTANCES DO NOT ALLOW FOR

EITHER IMMEDIATE OR FUTURE PAYMENT OF THE AMOUNT ORDERED.

PURSUANT TO 18 UNITED STATES CODE, SECTION 3612,

SUBDIVISION (F)(3)(A), INTEREST ON THE RESTITUTION ORDERED

IS WAIVED BECAUSE THE DEFENDANT DOES NOT HAVE THE ABILITY TO

PAY INTEREST.  PAYMENTS MAY BE SUBJECT TO PENALTIES FOR

DEFAULT AND DELINQUENCY, PURSUANT TO TITLE 18 UNITED STATES

CODE, SECTION 3612(G).

PURSUANT TO THE -- PURSUANT TO GUIDELINE SECTION

5E1.2(A), ALL FINES ARE WAIVED, AS THE COURT FINDS THAT THE

DEFENDANT HAS ESTABLISHED THAT HE IS UNABLE TO PAY OR NOT

LIKELY TO BECOME ABLE TO PAY ANY FINE.

1          PURSUANT TO THE SENTENCING REFORM ACT OF 1984, IT

2     IS THE JUDGMENT OF THE COURT THAT THE DEFENDANT, ROSHAUN

3     NAKIA PORTER, IS HEREBY COMMITTED ON COUNT ONE OF THE

4     EIGHT-COUNT, FIRST SUPERSEDING INDICTMENT TO THE CUSTODY OF

5     THE BUREAU OF PRISONS FOR A TERM OF 240 MONTHS.

6          UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT

7     SHALL BE PLACED ON SUPERVISED RELEASE FOR A TERM OF 10 YEARS

8     UNDER THE FOLLOWING TERMS AND CONDITIONS:  ONE, THE

9     DEFENDANT SHALL COMPLY WITH THE RULES AND REGULATIONS OF THE

10    UNITED STATES PROBATION OFFICE AND GENERAL ORDER 05-02;

11         TWO, THE DEFENDANT SHALL REFRAIN FROM ANY UNLAWFUL

12    USE OF A CONTROLLED SUBSTANCE.  THE DEFENDANT SHALL SUBMIT

13    TO ONE DRUG TEST WITHIN 15 DAYS OF RELEASE FROM IMPRISONMENT

14    AND AT LEAST TWO PERIODIC DRUG TESTS THEREAFTER, NOT TO

15    EXCEED EIGHT TESTS PER MONTH, AS DIRECTED BY THE PROBATION

16    OFFICER;

17         THREE, THE DEFENDANT SHALL PARTICIPATE IN AN

18    OUTPATIENT SUBSTANCE ABUSE TREATMENT AND COUNSELING PROGRAM

19    THAT INCLUDES URINALYSIS, BREATH AND/OR SWEAT-PATCH TESTING

20    AS DIRECTED BY THE PROBATION OFFICER.  THE DEFENDANT SHALL

21    ABSTAIN FROM USING ALCOHOL AND ILLICIT DRUGS AND FROM

22    ABUSING PRESCRIPTION MEDICATIONS DURING THE PERIOD OF

23    SUPERVISION;

24         FOUR, DURING THE COURSE OF SUPERVISION, THE

25    PROBATION OFFICER, WITH THE AGREEMENT OF THE DEFENDANT AND

1    DEFENSE COUNSEL, MAY PLACE THE DEFENDANT IN A RESIDENTIAL

2    DRUG TREATMENT PROGRAM APPROVED BY THE UNITED STATES

3    PROBATION OFFICE FOR THE TREATMENT OF NARCOTIC ADDICTION OR

4    DRUG DEPENDENCY, WHICH MAY INCLUDE COUNSELING AND TESTING TO

5    DETERMINE IF THE DEFENDANT HAS REVERTED TO THE USE OF DRUGS.

6    AND THE DEFENDANT SHALL RESIDE IN A TREATMENT PROGRAM UNTIL

7    DISCHARGED BY THE PROGRAM DIRECTOR AND PROBATION OFFICER;

8            FIVE, AS DIRECTED BY THE PROBATION OFFICER, THE

9    DEFENDANT SHALL PAY ALL OR PART OF THE COSTS OF TREATING THE

10   DEFENDANT'S SUBSTANCE ABUSE TREATMENT TO THE AFTERCARE

11   CONTRACTOR, DURING THE PERIOD OF COMMUNITY SUPERVISION.

12   PURSUANT TO TITLE 18 UNITED STATES CODE, SECTION 3672, THE

13   DEFENDANT SHALL PROVIDE PAYMENT AND PROOF OF PAYMENT AS

14   DIRECTED BY THE PROBATION OFFICER;

15           SIX, DURING THE PERIOD OF COMMUNITY SUPERVISION,

16   THE DEFENDANT SHALL PAY THE SPECIAL ASSESSMENT IN ACCORDANCE

17   WITH THIS JUDGMENT'S ORDERS PERTAINING TO SUCH PAYMENT;

18           SEVEN, THE DEFENDANT SHALL NOT OBTAIN OR POSSESS

19   ANY DRIVER'S LICENSE, SOCIAL SECURITY NUMBER, BIRTH

20   CERTIFICATE, PASSPORT, OR ANY OTHER FORM OF IDENTIFICATION

21   IN ANY NAME, OTHER THAN THE DEFENDANT'S TRUE LEGAL NAME, NOR

22   SHALL THE DEFENDANT USE FOR ANY PURPOSE OR IN ANY MANNER

23   OTHER THAN HIS TRUE LEGAL NAME OR NAMES WITHOUT THE PRIOR

24   APPROVAL OF THE PROBATION OFFICER;

25           EIGHT, THE DEFENDANT SHALL COOPERATE IN THE

1   COLLECTION OF A DNA SAMPLE FROM THE DEFENDANT;

2        NINE, THE DEFENDANT SHALL REGISTER AS A SEX

3   OFFENDER AND KEEP THE REGISTRATION CURRENT IN EACH

4   JURISDICTION WHERE HE RESIDES, WHERE HE IS AN EMPLOYEE AND

5   WHERE HE IS A STUDENT TO THE EXTENT THE REGISTRATIONS HAVE

6   BEEN ESTABLISHED IN EACH JURISDICTION.  WHEN REGISTERING FOR

7   THE FIRST TIME, THE DEFENDANT SHALL ALSO REGISTER IN THE

8   JURISDICTION IN WHICH THE CONVICTION OCCURRED, IF DIFFERENT

9   FROM HIS JURISDICTION OF RESIDENCE.  THE DEFENDANT SHALL

10   PROVIDE PROOF OF REGISTRATION TO THE PROBATION OFFICER

11   WITHIN THREE DAYS OR RELEASE FROM IMPRISONMENT;

12        TEN, THE DEFENDANT SHALL PARTICIPATE IN

13   PSYCHOLOGICAL COUNSELING, OR PSYCHIATRIC TREATMENT, OR SEX

14   OFFENDER TREATMENT PROGRAM AS APPROVED AND DIRECTED BY THE

15   PROBATION OFFICER.  THE DEFENDANT SHALL ABIDE BY ALL RULES,

16   REQUIREMENTS AND CONDITIONS OF SUCH PROGRAM.  THE PROBATION

17   OFFICER SHALL DISCLOSE THE PRESENTENCE REPORT OR ANY

18   PREVIOUS MENTAL HEALTH EVALUATIONS OR REPORTS TO THE

19   TREATMENT PROVIDER;

20        ELEVEN, AS DIRECTED BY PROBATION OFFICER, THE

21   DEFENDANT SHALL PAY ALL OR PART OF THE COSTS OF TREATING THE

22   DEFENDANT'S PSYCHOLOGICAL, PSYCHIATRIC DISORDERS TO THE

23   AFTERCARE CONTRACTOR DURING THE PERIOD OF COMMUNITY

24   SUPERVISION.  PURSUANT TO 18 UNITED STATES CODE, SECTION

25   3672, THE DEFENDANT SHALL PROVIDE PAYMENT AND PROOF OF

1    PAYMENT AS DIRECTED BY THE PROBATION OFFICER;

2           TWELVE, THE DEFENDANT SHALL NOT VIEW OR POSSESS

3    ANY MATERIALS, INCLUDING PICTURES, PHOTOGRAPHS, BOOKS,

4    WRITINGS, DRAWINGS, VIDEOS, OR VIDEO GAMES DEPICTING AND/OR

5    DESCRIBING CHILD PORNOGRAPHY, AS DEFINED AT 18 UNITED STATES

6    CODE, SECTION 2256(8), OR SEXUALLY EXPLICIT CONDUCT, AS

7    DEFINED AT 18 UNITED STATES CODE, 2256 SUBDIVISION (2).

8    THIS CONDITION DOES NOT PROHIBIT THE DEFENDANT FROM

9    POSSESSING MATERIALS SOLELY BECAUSE THEY ARE NECESSARY TO

10   AND USED FOR A COLLATERAL ATTACK, NOR DOES IT PROHIBIT HIM

11   FROM POSSESSING MATERIALS PREPARED FOR AND USED FOR THE

12   PURPOSES OF HIS COURT-MANDATED SEX OFFENDER TREATMENT WHEN

13   THE DEFENDANT'S TREATMENT PROVIDER OR THE PROBATION OFFICER

14   HAS APPROVED OF HIS POSSESSION OF THE MATERIALS IN ADVANCE;

15          THIRTEEN, THE DEFENDANT SHALL NOT CONTACT THE

16   VICTIMS BY ANY MEANS, INCLUDING IN PERSON, BY MAIL OR

17   ELECTRONIC MEANS, OR VIA THIRD PARTIES.  FURTHER, THE

18   DEFENDANT REMAIN AT LEAST 100 YARDS FROM THE VICTIMS AT ALL

19   TIMES.  IF ANY CONTACT OCCURS, THE DEFENDANT SHALL

20   IMMEDIATELY LEAVE THE AREA OF CONTACT AND REPORT THE CONTACT

21   TO THE PROBATION OFFICER;

22          FOURTEEN, OTHER THAN HIS OWN MINOR CHILDREN, THE

23   DEFENDANT SHALL NOT ASSOCIATE OR HAVE VERBAL, WRITTEN,

24   TELEPHONIC, OR ELECTRONIC COMMUNICATION WITH ANY PERSON

25   UNDER THE AGE OF 18, EXCEPT:  (A), IN THE PRESENCE OF THE

1    PARENT OR LEGAL GUARDIAN OF SAID MINOR; AND (B), ON THE

2    CONDITION THAT DEFENDANT NOTIFY SAID PARENT OR LEGAL

3    GUARDIAN OF HIS CONVICTION IN THE INSTANT OFFENSE OR PRIOR

4    OFFENSE.  THIS PROVISION DOES NOT ENCOMPASS PERSONS UNDER

5    THE AGE OF 18, SUCH AS WAITERS, CASHIERS, TICKET VENDORS,

6    ET CETERA, WHOM THE DEFENDANT MUST INTERACT WITH IN ORDER TO

7    OBTAIN ORDINARY AND USUAL COMMERCIAL SERVICES;

8        FIFTEEN, THE DEFENDANT SHALL NOT AFFILIATE WITH,

9    OWN, CONTROL, VOLUNTEER AND/OR BE EMPLOYED ANY CAPACITY BY A

10   BUSINESS AND/OR ORGANIZATION THAT CAUSES HIM TO REGULARLY

11   CONTACT PERSONS UNDER THE AGE OF 18.  THE DEFENDANT SHALL

12   NOT AFFILIATE WITH, OWN, CONTROL OR BE EMPLOYED IN ANY

13   CAPACITY WHOSE PRINCIPAL -- BY A BUSINESS WHOSE PRINCIPAL

14   PRODUCT IS THE PRODUCTION AND/OR SELLING OF MATERIALS

15   DEPICTING AND/OR DESCRIBING SEXUALLY EXPLICIT CONDUCT, AS

16   DEFINED IN 18 UNITED STATES CODE, SECTION 2256, SUBDIVISION

17   (2);

18       SEVENTEEN, THE DEFENDANT'S EMPLOYMENT SHALL BE

19   APPROVED BY THE PROBATION OFFICER AND ANY CHANGE IN

20   EMPLOYMENT MUST BE PRE-APPROVED BY THE PROBATION OFFICER.

21   THE DEFENDANT SHALL SUBMIT THE NAME AND ADDRESS OF THE

22   PROPOSED EMPLOYER TO THE PROBATION OFFICER AT LEAST 10 DAYS

23   PRIOR TO ANY SCHEDULED CHANGE;

24       EIGHTEEN, THE DEFENDANT SHALL SUBMIT HIS PERSON

25   AND ANY PROPERTY, HOUSE, RESIDENCE, VEHICLE, PAPERS,

1  COMPUTER, OTHER ELECTRONIC COMMUNICATION OR DATA STORAGE

2  DEVICES AND MEDIA AND HIS EFFECTS TO SEARCH AT ANY TIME WITH

3  OR WITHOUT WARRANT BY ANY LAW ENFORCEMENT OR PROBATION

4  OFFICER WITH REASONABLE SUSPICION CONCERNING A VIOLATION OF

5  A CONDITION OF SUPERVISED RELEASE OR UNLAWFUL CONDUCT BY THE

6  DEFENDANT AND BY ANY PROBATION OFFICER IN THE LAWFUL

7  DISCHARGE OF THE OFFICER'S SUPERVISION FUNCTION;

8            NINETEEN, THE DEFENDANT SHALL POSSESS AND USE ONLY

9  THOSE COMPUTERS AND COMPUTER-RELATED DEVICES, SCREEN USER

10  NAMES, PASSWORDS, E-MAIL ACCOUNTS AND INTERNET SERVICE

11  PROVIDERS WHICH HAVE BEEN DISCLOSED TO THE PROBATION OFFICER

12  UPON COMMENCEMENT OF SUPERVISION.  ANY CHANGES OR ADDITIONS

13  ARE TO BE DISCLOSED TO THE PROBATION OFFICER PRIOR TO THE

14  FIRST USE.  COMPUTERS AND COMPUTER-RELATED DEVICES ARE

15  PERSONAL COMPUTER, PERSONAL DATA ASSISTANTS, INTERNET

16  APPLIANCES, ELECTRONIC GAMES, CELLULAR TELEPHONES AND

17  DIGITAL STORAGE MEDIA, AS WELL AS THEIR PERIPHERAL

18  EQUIPMENT, THAT CAN ACCESS, OR THAT CAN BE MODIFIED TO

19  ACCESS THE INTERNET, ELECTRONIC BULLETIN BOARDS AND OTHER

20  COMPUTERS;

21            TWENTY, ALL COMPUTERS, COMPUTER-RELATED DEVICES

22  AND THEIR PERIPHERAL EQUIPMENT USED BY THE DEFENDANT SHALL

23  BE SUBJECT TO SEARCH AND SEIZURE.  THIS SHALL NOT APPLY TO

24  ITEMS USED AT THE EMPLOYMENT SITE WHICH ARE MAINTAINED AND

25  MONITORED BY THE EMPLOYER;

1          TWENTY-ONE, THE DEFENDANT SHALL COMPLY WITH THE

2     RULES AND REGULATIONS OF THE COMPUTER MONITORING PROGRAM.

3     THE DEFENDANT SHALL PAY THE COSTS OF THE COMPUTER-MONITORING

4     PROGRAM IN AN AMOUNT NOT TO EXCEED $32 PER MONTH, PER DEVICE

5     CONNECTED TO THE INTERNET.  AND THE COURT AUTHORIZES THE

6     PROBATION OFFICER TO DISCLOSE THE PRESENCE REPORT TO THE

7     SUBSTANCE ABUSE TREATMENT PROVIDER TO FACILITATE THE

8     DEFENDANT'S TREATMENT FOR NARCOTIC ADDICTION OR DRUG

9     DEPENDENCY.  FURTHER, DISCLOSURE OF THE PRESENCE REPORT

10    BY THE TREATMENT PROVIDER IS PROHIBITED WITHOUT THE CONSENT

11    OF THE SENTENCING JUDGE.

12          I SHOULD MAKE CLEAR THAT THE COMPUTER PROVISIONS

13    IN THIS JUDGMENT RELATE TO THE FACT THAT THE DEFENDANT DID

14    TAKE PHOTOGRAPHS AND VIDEOS OF THE VICTIM, DID POST THOSE

15    THINGS ON THE INTERNET, DID USE THE INTERNET TO FACILITATE

16    THE ILLEGAL CONDUCT.  TO THE EXTENT THAT WASN'T CLEAR, THE

17    COURT WANTS TO MAKE THAT CLEAR FOR THE RECORD.

18          AND WITH THAT, OTHER THAN ANY REASONS ALREADY

19    ARGUED, DOES EITHER SIDE KNOW OF ANY REASON WHY SENTENCE MAY

20    NOT BE IMPOSED AS STATED?

21          MS. LEAL:  NO, YOUR HONOR.

22          MS. CORRIGAN:  NO, YOUR HONOR.

23          THE COURT:  AND THE COURT ORDERS THE SENTENCE

24    IMPOSED AS STATED.

25          MR. PORTER, YOU HAVE A RIGHT TO APPEAL YOUR

1    CONVICTION, IF YOU BELIEVE THAT YOUR GUILTY PLEA WAS SOMEHOW

2    UNLAWFUL, OR INVOLUNTARY, OR IF THERE WAS SOME OTHER

3    FUNDAMENTAL DEFECT IN THE PROCEEDING THAT WAS NOT WAIVED BY

4    YOUR GUILTY PLEA.

5          YOU ALSO HAVE THE RIGHT TO APPEAL YOUR SENTENCE.

6    UNDER SOME CIRCUMSTANCES, PARTICULARLY, IF YOU BELIEVE YOUR

7    SENTENCE IS CONTRARY TO LAW, A DEFENDANT MAY WAIVE THOSE

8    RIGHTS AS PART OF A PLEA AGREEMENT.  YOU HAVE ENTERED INTO A

9    PLEA AGREEMENT THAT WAIVES SOME OR ALL OF YOUR RIGHT TO

10   APPEAL THE SENTENCE ITSELF.

11         WHILE THOSE WAIVERS ARE GENERALLY ENFORCEABLE, IF

12   YOU BELIEVE IT'S UNENFORCEABLE, YOU DO HAVE THE RIGHT TO

13   PRESENT THAT THEORY TO THE COURT OF APPEALS.

14         WITH FEW EXCEPTIONS, ANY NOTICE OF APPEAL MUST BE

15   FILED WITHIN 14 DAYS OF THE ENTRY OF THE JUDGMENT.

16         DO YOU UNDERSTAND?

17         DEFENDANT PORTER:  YES.

18         THE COURT:  ALL RIGHT.  IS THERE ANYTHING FURTHER

19   THAT IS NEEDED FROM THE COURT AT THIS TIME?

20         MS. LEAL?

21         MS. LEAL:  YES, YOUR HONOR.

22         THE GOVERNMENT MOVES TO DISMISS THE REMAINING

23   COUNTS OF THE FIRST SUPERSEDING INDICTMENT.

24         THE COURT:  AND THAT MOTION IS GRANTED AND THOSE

25   REMAINING COUNTS ARE DISMISSED.

1           MS. CORRIGAN:  YOUR HONOR, I DON'T THINK THAT

2    THE -- I SAW THE COURT REPORTER.  I DON'T THINK THAT MY

3    CLIENT'S RESPONSE TO YOUR QUESTION RELATIVE TO APPELLATE

4    RIGHTS WAS AUDIBLE.  IF I COULD JUST CHECK WITH THE COURT

5    REPORTER.

6           I HEARD HIM SAY "YES."

7           THE COURT:  I DO HAVE IT IN THE RECORD.

8           MS. CORRIGAN:  THANK YOU.

9           THE COURT:  "YES."

10           AND IS THERE -- AGAIN, OTHER THAN THAT, IS THERE

11    ANYTHING FURTHER THAT'S NEEDED?

12           I WILL ASK THIS; AND THAT IS, IT WASN'T MENTIONED.

13    I BELIEVE IT MIGHT HAVE BEEN IN THE PAPERS:  ARE YOU

14    REQUESTING A PLACEMENT IN A SOUTHERN CALIFORNIA FACILITY?

15           MS. CORRIGAN:  I AM, YOUR HONOR.  ALSO, WITH

16    RECOMMENDATION TO THE RDAP PROGRAM.

17           THE COURT:  ALL RIGHT.  SO THE COURT WILL DO WHAT

18    IT DOES IN OTHER INSTANCES, WHICH IS RECOMMEND THAT THE

19    BUREAU OF PRISONS CONSIDER THE DEFENDANT FOR PLACEMENT IN

20    RDAP.  AND TO THE EXTENT THAT SUCH A PROGRAM IS AVAILABLE IN

21    SOUTHERN CALIFORNIA, THAT HE BE PLACED IN A SOUTHERN

22    CALIFORNIA FACILITY SO THAT HE MAY MAINTAIN THE SUPPORT OF

23    HIS FAMILY AND FRIENDS AND MAY MAINTAIN CONTACT WITH HIS

24    FAMILY AND CHILDREN.

25           MS. CORRIGAN:  THANK YOU.

1            THE COURT:  ALL RIGHT.  ANYTHING ELSE?

2            MS. LEAL:  THANK YOU.

3            THE COURT:  THANK YOU.

4            THE CLERK:  ALL RISE.

5        *(AT 11:47 A.M., PROCEEDINGS WERE ADJOURNED.)*

6

7                         -OOO-

8

9                       CERTIFICATE

10           I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

11   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

12   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

13   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

14   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

15   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

16

17   DATE:  JUNE 9, 2015

18

19

20                    _____/S/DEBORAH D. PARKER_____
                      DEBORAH D. PARKER, OFFICIAL REPORTER
21

22

23

24

25